## MONTGOMERY v. HUNDLEY, Appellant.

**Division One, June 29, 1907.**

1. **RESCINDING CONTRACT: Agent Selling His Own Stock.** If defendant was plaintiff's agent to purchase stock of a corporation and in fact sold to him his own stock, and withheld from him the fact that he was the owner, plaintiff has the right to rescind the sale and recover from defendant the full purchase price with interest.

2. ———: ———: **No Damages.** Nor is plaintiff's right to rescind the sale, in such case, impaired by the fact that the sale was beneficial to him. Such contracts are against public policy.

3. ———: ———: **Option: By-laws.** A clause in the by-laws of a corporation requiring the record owner of stock "to offer it and give the preference to this corporation before selling the same to a new stockholder," gave an option to the company on the stock of a stockholder who wished to sell, but not to another stockholder. And such by-law is of little value in establishing the relation of principal and agent between plaintiff, who purchased the stock of a retiring stockholder, and defendant, another stockholder, who sold him that stock.

4. ———: ———: **Option: Evidence of Defendant's Ownership.** A stockholder, who wished to retire on account of his wife's ill-health, offered his $3,750 of stock to the other two stockholders for $5,750. They were not able to buy, and he agreed that one of them (defendant) might sell it and have all he could get over $5,750. Defendant then wrote to plaintiff that "one of" the stockholders "wishes to sell his fourth interest; will take $7,000 to buy him out." On being assured by defendant that there was nothing in the deal for him, plaintiff bought the stock for $7,000, sending part of the money to defendant, and the balance to the retiring stockholder, receiving the certificate of stock assigned to him by such retiring stockholder. Subsequently defendant wrote plaintiff that the retiring stockholder did not give him "$1,200 to make the sale. I do not mind telling you that I got $1,250 out of it, but he did not give it to me. I had an option on his stock at $5,750, and you bought it at the lowest possible dollar that would buy it. He offered it to me by virtue of a clause in our by-laws which provided that he had to give me the opportunity to buy it before offering it to any one else. He made me the price and I immediately took an option upon it, intending to buy it myself, if I could not find some satisfactory person to take it. I was not in shape at the time to buy it my-

self and thought you would be glad to get an investment of this kind." This was the only option developed by the evidence. The by-laws did not require an offer to sell to be first made to other stockholders, but to the corporation. Plaintiff prior to the sale did not talk about it to the retiring stockholder, who testified that he had an arrangement with defendant by which he could take the stock and handle it for him at $5,750, and defendant denied he was the plaintiff's agent, but testified that he did not go to the retiring stockholder and make the trade with him after he talked with plaintiff, but stated "the trade was made before I sold it" to plaintiff. *Held*, first, that the evidence was sufficient to sustain the verdict of the jury that defendant held an option on the stock; *second*, that it was an option personal to him and not to the corporation; *third*, defendant by paying $5,750 to the retiring stockholder was entitled to his stock; and, *fourth*, this made him such an owner of the stock as entitles plaintiff to have the sale rescinded and recover the price paid. with interest.

5. ———: ———: **Definition of Option.** The obligation, by which one binds himself to sell, and leaves it discretionary with the other party to buy, is what in law is termed an option, which is simply a contract by which the owner of property agrees with another that he shall have the right to buy the property at a fixed price within a certain time. If defendant had a valid and subsisting option to buy a fellow stockholder's stock at a stipulated price, he had the right to accept and perform the terms of the option, and then his title to the stock became complete; and when within the life of the option he sold the stock to plaintiff and had the stockholder transfer it directly to plaintiff, that was equivalent to going to the stockholder and accepting the terms of the option, taking the transfer to himself, and then transferring it to plaintiff; and if he withheld the facts from plaintiff, he was such owner of the stock as entitles plaintiff to rescind the sale.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson*, Judge.

AFFIRMED.

*Culver & Phillip* for appellant.

(1) The court erred in refusing to give the demurrer to the evidence asked by defendant at the close of plaintiff's testimony, and at the close of all the evi-

dence. There is no allegation in the petition and there is no evidence in the record that plaintiff bought the stock from defendant. All of the evidence is that plaintiff purchase the stock from Shackelford. In fact the only instruction asked by plaintiff and which the court gave, does not require the jury to find that plaintiff bought the stock from defendant, in order to authorize a verdict for plaintiff, but it is drawn on the theory that if defendant was plaintiff's agent in the purchase of the stock, and he falsely represented to his principal that $7,000 was the least money that would buy it, and concealed the fact that he had an option on it, and received $1,250 of the proceeds of the sale, then plaintiff was entitled to recover from his agent, the defendant, $7,000, the purchase of the stock. This is not an action at law or in equity by a principal to recover from his agent profits secretly made by the latter, in the prosecution of the business of the principal. This is an action to rescind a sale of stock purchased from Shackelford, and to recover the purchase price on the ground that the purchase was induced by the false representations of the defendant. Such an action will not lie against defendant, whether he was plaintiff's agent or not. It requires no authorities to support the self-evident proposition that in order to rescind a sale induced by fraud, and recover the purchase money, the purchaser must sue the seller. If the purchaser was induced to purchase by the fraudulent representations of his own agent, this would not give him the right to maintain an action against his agent to rescind the sale and recover the purchase money from the agent, as plaintiff seeks to do in this case; though, of course, the agent, in such circumstances, would be liable to his principal in an action for damages for any loss sustained, or for any profit made by the agent above his compensation. McMillan v. Arthur, 48 N. Y. Super. Ct. 424. (2) A finding that

defendant was in fact the owner of the stock, and that he, in fact, sold it to plaintiff through Shackelford, is not sustained· by any substantial evidence. Without such a finding the verdict cannot stand.

*Charles F. Strop* and *Eugene Silverman* for respondent.

A person acting as purchasing agent for another cannot buy his own property in behalf of his principal. And it makes no difference that the agent acts in good faith or that the transaction was not detrimental to the principal, or even that the principal was benefited. Such contracts are opposed to open, upright and fair dealing and against public policy. Conkey v. Bond, 36 N. Y. 427; Taussig v. Hart, 58 N. Y. 429; Pegram v. Charlotte, 84 N. C. 696, 37 Am. Rep. 643; Davis v. Hamlin, 108 Ill. 39; Tewksbury v. Sprann, 75 Ill. 188; Ely v. Hanford, 65 Ill. 267; Everhart v. Searle, 71 Pa. St. 260; Rice v. Wood, 133 Miss. 133; Bisshoffsheim v. Blatzer, 20 Fed. 892; Frieshenhann v. Bushnell, 47 Minn. 446; Conner v. Block, 119 Mo. 134.

GRAVES, J.—This is an action to rescind a contract of sale and to recover $7,000, the amount of the purchase price involved in such sale. The facts are these: The Union Mercantile Company was a corporation, whose principal place of business was at St. Joseph, Missouri. It was engaged in the mercantile business and had stores at St. Joseph, Missouri, Topeka, Kansas, and Lincoln, Nebraska. Its capital stock was $15,000, divided into 150 shares of $100 each. Of these shares the defendant Hundley owned seventy-five, or one-half of the total; J. F. Shackelford owned thirty-seven and one-half, or one fourth, and C. K. McKnight thirty-seven and one-half, or one fourth. A part of one of the by-laws of the corporation reads as follows:

"Any stockholder desiring to sell his stock must offer it and give the preference to this corporation before selling the same to a new stockholder."

It appears that J. L. Shackelford, owing to the illness of his wife, desired to dispose of his thirty-seven and one-half shares of stock, and go west for his wife's health. He offered the stock to Hundley and McKnight for $5,750. Defendant said he was not able to purchase at that time, but would sell the stock as it was worth more than the price asked by Shackelford.

He and Shackelford then agreed that defendant might sell said stock and have all he could get over the $5,750. At this juncture in affairs, the defendant, who was a business friend of the plaintiff, wrote the plaintiff the following letter:

"St. Joseph, Mo., 4—23, 1903.
"Mr. Montgomery,
    "Maryville, Mo.,
"Dear Sir:—
    "Would you like to buy in a mercantile business here that is 'gilt edge'? I have one-half — the other half is owned by two parties active in the business. One of them wants to sell his one-fourth interest. Will take $7,000 to buy him out —not necessarily all cash.
    "Will make you 40 or 50 per cent at least on your money.
    "If interested will write you more fully. It's a 'hummer.'                    "Yours truly,
                        "Woodson Hundley."

In a few days after the receipt of this letter the plaintiff went to St. Joseph, looked through the stock there, saw some statements as to the business, furnished by the bookkeeper, and after asking Hundley if $7,000 was the least money that would buy the stock, and being assured by Hundley that it was, and further assured that said sum was the least money that would

buy the stock, and that there was nothing in it (the deal) for Hundley, he then told Hundley to buy the stock for him. Plaintiff then returned home, and later sent part of the money to Hundley and still later the balance to Shackelford, receiving the certificates of stock assigned by Shackelford to him.

In evidence and upon which plaintiff largely relies is the following letter:

"St. Joseph, Mo., May 28th, 1903.

"Mr. J. F. Montgomery,
"Maryville, Mo.
"Dear Sir:—

"In reply to yours of 5—26, contents very carefully noted. It is evident to my mind that you have not looked into this business carefully enough to satisfy yourself as to the good points of it and on account of the stand you have taken regarding it, I do not see any use arguing the good points with you. However, I will make one explanation regarding the statement you made in your letter, that Mr. Shackelford gave me $1,200 to make the sale. This is false.

"I do not mind telling you that I got $1,250 out of it, but he did not give it to me. I had an option on his stock at $5,750 and you bought it at the lowest possible dollar that would buy it. When he first offered his stock for sale, he offered it to me by virtue of a clause in our by-laws which provided for such an arrangement, he had to give me or McKnight the opportunity to buy it before offering it to any one else.

"Mr. Shackelford was anxious to get out and apparently did not know or care anything about the value of this stock. He made me the price and I immediately took an option upon it, intending to buy it myself, if I could not find some satisfactory person to take it. I was not in shape at the time to buy it myself and thought you would be glad to get an investment of

this kind. I cannot see that you have any complaint to make regarding the price. The stock is worth more than you paid for it and I can prove it.

"Now put yourself in my place and see if I have done anything wrong. When I bought in that business myself, I paid one of the parties a bonus and knew it at the time I bought in, and I bought in there exactly on the same basis you did. However, if you are not satisfied I will see that you get out and get out whole. It will not be necessary for you to lose any money on the deal, but I want you to understand that I have misrepresented nothing to you about that business, to the best of my knowledge. Whatever I told you about it I believed was right and wish you would look up my record and see if I am in the habit of doing anything of that kind.

"I feel that you have hardly done me justice in this thing in jumping at conclusions the way you have, and at the same time understand that through your lack of familiarity with the business, and lack of confidence in us, with perhaps some influences at work, which are unjust, you have hastily made up your mind to sell out. This, I repeat, is all right and I am willing to help you out at the very earliest time possible, and will see that you lose nothing by this deal. At the same time I say this to you, I ask you to rest assured that there is absolutely no ill-feeling in this matter whatever, on my part, and that I only wish to do what is right toward you, and see you satisfied.

"I cannot do anything with this matter this week, however, as we are invoicing, but will let you hear from me next week, something more definite. With best regards, I am, Yours Very Truly,

"S. W. HUNDLEY."

The stock was shortly thereafter tendered back to defendant, the purchase price demanded of him and upon September 5, following, this suit was instituted.

There are allegations in the petition of fraudulent representations, other than the statement made by defendant that there wasn't a cent in the trade for him. Of these, however, there is no evidence. Plaintiff testified that defendant was his agent to buy the stock, and that he had bought goods of defendant's father for a great number of years, and had an intimate business acquaintance with the defendant for two or three years, and relied fully upon defendant's statements. For the defendant a part of the evidence tended to show that he had no other option on the stock in question than the one provided for in the by-laws of the corporation.

J. L. Shackelford, one of defendant's witnesses, on cross-examination, testified: "Q. You had an agreement with him (Hundley) that he could take this stock and handle it for you at $5,750? A. Yes, sir."

By defendant it was also shown that defendant had a copy of the by-laws before he directed the purchase of the stock. Defendant also testified that he did not buy the stock for plaintiff and that he did not tell plaintiff that he (defendant) was not interested in the stock in any way, and was getting nothing out of it. The defendant among other things, says:

"Q. Did Mr. Shackelford offer the stock to you, pursuant to the terms of the by-laws? A. He did.

"Q. Did you buy it. A. No.

"Q. Why didn't you buy? A. I didn't have the money to buy it at the time.

"Q. Now what arrangement, if any, was that made between Shackelford and yourself regarding the stock? A. Mr. Shackelford seemed very anxious to get out, and I told him that I thought I could get a better price for it, that I thought he was selling the stock entirely too cheap, and I thought I could get more money for it and I asked him if he would allow me to have all

205 Sup—10

I could get over that price; I looked into the business and I found that I thought that seven thousand dollars would be a reasonable price for it, and I put that price on the stock myself, and the arrangement with Mr. Shackelford was, that I was to sell this stock for him and was to make whatever price on it I wanted to, as long as I got him the amount of money he was asking for it. He realized and said at the time he knew he was selling the stock cheaper than it was worth.''

And on cross-examination the same witness, says:

"Q. You never did tell Montgomery that you were making any commission out of this until after this was over? A. No.

"Q. You concealed that fact from him, didn't you? A. Well, I didn't tell him.

"Q. It was your purpose to keep him from knowing that fact, wasn't it? A. I did not think it was necessary to the transaction.

"Q. You didn't think so. You did not think it worth while to tell him, but you did purposely keep it from him, didn't you? A. If you want to construe it that way. . . .

"Q. You say it was not convenient for you to handle the stock at $5,750? A. Yes, sir.

"Q. You say he made a price for the stock and you immediately took an option on it to buy it yourself. You didn't intend to buy it? A. We did at first. Mr. McKnight and I talked of buying it.

"Q. You had no intention of buying it at the time you got Montgomery on the string? A. No.

"Q. Now, Mr. Hundley, at the time you got Montgomery on the string to make this trade with him, at the time you begun to trade with Montgomery or commenced talking with him, you had given up the intention of buying it for yourself, had you? A. In one way I had and in one way I had not.

"Q. Which way had you and which way hadn't

you? A. I thought I could get more money for the stock than that, and I would not stand by and see the stock sold for less than seven thousand dollars; that I would buy it for myself before I would see it sold for less money.

"Q. You say that Shackelford paid you a commission of $1,250. A. He did. . . .

"Q. Now, you said your by-laws made it obligatory upon him to offer this stock to you? A. Yes, sir.

"And then you told him that it was not convenient for you to buy it, didn't you? A. Yes.

"Q. And afterwards you and he made another arrangement independent of the by-laws that you would have whatever you could get of this stock over and above $5,750. A. Yes, but it was my option on it.

"Q. That arrangement was not pursuant to the by laws. The by-laws provided, Mr. Hundley, that you should have a right to acquire it at a certain price, or should have the first offer of it? A. Yes, sir.

"Q. Now you say you told him that you could not avail yourself of that option, and that afterwards you and he made an arrangement by which you were to have all over and above $5,750 that you got for the stock? A. Yes, sir. . . .

"Q. Mr. Montgomery never talked to Mr. Shackelford about this sale at all, as far as you know, did he? A. No, not that I know of.

"Q. You say that you did not act as Montgomery's agent? A. I didn't see how I could.

"Q. Well, you did not agree that you would? A. No.

"Q. And you didn't agree that you would buy it for him? A. No.

"Q. Who did act for him? You went and made the trade with Shackelford after you talked with Montgomery, did you not? A. No I did not. The trade was made before I sold it to Mr. Montgomery.

"Q. The trade was made before? A. That was my arrangement with Mr. Shackleford; I simply notified Mr. Shackelford that Mr. Montgomery had said that he would buy the stock and would send the money along in a few days."

This sufficiently states the evidence. The cause was submitted to the jury and a verdict returned for plaintiff in the sum of $7,186.66, upon which judgment was entered, from which judgment, after taking the necessary preliminary steps, defendant appeals to this court. Points made will be noticed in the course of the opinion.

I. Plaintiff's recovery was grounded on the theory that defendant was his agent for the purpose of purchasing this stock and sold to plaintiff stock which defendant owned. The suit is not bottomed upon any other theory. It is not an action to recover secret profits, nor an action for damages based purely upon deceit and fraud. It is an action to rescind a sale and recover the purchase price. If defendant was agent of plaintiff to purchase the stock and in fact sold to plaintiff his own stock, then there can be no question of plaintiff's right to rescind the sale and recover the full purchase price, with interest. This doctrine is firmly fixed by the adjudicated cases. In a very similar case, Conkey v. Bond, 36 N. Y. l. c. 429, it is said:

"There is no view of the facts in which the transaction can be upheld. He stood in a relation to his principal which disabled him from concluding a contract with himself, without the knowledge or assent of the party he assumed to represent. He undertook to act at once as seller and purchaser. He bought as agent, and sold as owner. The *ex parte* bargain, thus concluded, proved advantageous to him and very unfortunate for his principal. It was the right of the latter to rescind it, on discovery of the breach of confidence. It is not material to inquire whether the defend-

ant had any actual fraudulent purpose. The making of a purchase from himself, without authority from the plaintiff, was a constructive fraud, in view of the fiduciary relation which existed between the parties."

In Tewksbury v. Spruance, 75 Ill. 1. c. 188, the doctrine is stated in this language: "In regard to the law involved in this case, there is no ground for dispute. An agent or broker employed to purchase for his principal cannot become the seller without notice to the principal. If appellees, as commission merchants, were employed by appellants to go upon the market and buy for them a certain quantity of wheat for cash, this would not authorize appellees to turn over to appellants wheat held by them, even if they charged no more than the market price, unless the fact was disclosed to the principals."

Nor does it militate against the right to rescind the contract and recover the contract price, that the sale was beneficial to the principal and worked no damage to him. Such contracts are against public policy. In Everhart v. Searle, 71 Pa. St. 1. c. 260, the Supreme Court of Pennsylvania, through THOMPSON, C. J., says: "There was plausibility and seeming force in the argument that as Flagg, the plaintiff's principal in the sale, was not injured by the arrangement with the defendant, there was nothing wrong in making that arrangement. This is specious, but not sound. The transaction is to be regarded as against the policy of the law, and not binding upon a party who has the right to object to it. 'It matters not,' it is said, page 210 of Hare and Wallace's Notes, 1 Lead. Cases in Eq., 'that there was no fraud meditated and no injury done; the rule is not intended to be remedial of actual wrong, but preventative of the possibility of it.' This was said of 'any one who acts representatively, or whose office is to advise or operate, not for himself, but for others.' "

And again, in Minnesota, Friesenhahn v. Bush-

nell, 47 Minn. l. c. 446, the doctrine is tersely stated, thus: "Loyalty to his trust is the first duty of an agent, and he must not put himself in relations antagonistic to his principal. An agent authorized to purchase may not purchase from himself without his principal's consent; and, if he does, the principal, upon ascertaining the fact, may repudiate; and it makes no difference that the principal was not injured."

Along the same line, our own court, in case of Connor v. Black, 119 Mo. l. c. 134, puts the proposition thus: "The law is, that a broker or commission merchant has no right to buy from, or sell to his principal, without his knowledge and consent, and that in such case the fact that the price paid was the fair market value, and that the transaction was a fair one and free from fraud or any undue advantage, is no legal justification or excuse."

So that it would appear that if the facts of this case brings it within this principal of law, there is no question of the plaintiff's right to rescind the sale and recover the purchase price, and the judgment should be affirmed, if no errors appear in the course of the trial. The application of this law to the facts we discuss next.

II. What was defendant's relation to this stock? That he was not absolute owner is clear. It had not been transferred to him on the books of the corporation and did not stand in his name. By the by-law of the corporation, Shackelford, the record owner of the stock, had "to offer it and give the preference to this corporation before selling the same to a new stockholder." This in our judgment gave an option to the corporation but not to Hundley, the defendant. This by-law is of but little value to plaintiff's case.

The evidence shows that it had been offered to the corporation and to the other two stockholders at $5,750, but the offer was not accepted.

The only things that show any interest in this stock by defendant, appear in this admission in the letter of May 28th:

"Mr. Shackelford was anxious to get out and apparently did not know or care anything about the value of this stock. He made me the price and I immediately took an option upon it, intending to buy it myself if I could not find some satisfactory person to take it."

And in his further admission on the witness stand, as follows:

"Q. And afterwards you and he made another arrangement independent of the by-laws that you would have whatever you could get out of this stock over and above $5,750? A. Yes, but it was my option on it.

"Q. That arrangement was not pursuant to the by-laws. The by-laws provided, Mr. Hundley, that you should have a right to acquire it at a certain price, or should have the first offer of it? A. Yes, sir.

"Q. Now you say you told him you could not avail yourself of that option, and that afterwards you and he made an arrangement by which you were to have all over and above $5,750 that you got for the stock? A. Yes, sir. . . .

"Q. Mr. Montgomery never talked to Mr. Shackelford about this sale at all, as far as you know, did he? A. No, not that I know of.

"Q. You say you did not act as Montgomery's agent. A. I didn't see how I could.

"Q. Well, you did not agree that you would? A. No.

"Q. And you didn't agree that you would buy it for him? A. No.

"Q. Who did act for him? You went and made the trade with Shackelford after you talked with Montgomery, didn't you? A. No I did not. The trade was made before I sold it to Mr. Montgomery.

"Q. The trade was made before? A. That was my arrangement with Mr. Shackelford; I simply notified Mr. Shackleford that Mr. Montgomery had said that he would buy the stock and would send the money along in a few days."

And the statement of Shackelford on the witness stand in this language:

"Q. You had an agreement with him (Hundley) that he could take this stock and handle it for you at $5,750? A. Yes, sir."

The question now is, does this show that Hundley had an option upon this stock, and if so, is an option such an ownership as will bring into operation the rule of law suggested in our paragraph one?

We think that these admissions are sufficient to sustain the verdict of the jury upon the question that defendant held an option upon this stock. That it was an option personal to him and not to the corporation. His letter in plain terms admits that he had an option. His language on the witness stand, as an admission, is practically as strong. He says in effect that after he made the trade with plaintiff he did not have to talk with Shackelford because he and Shackelford had made their trade before. The language above quoted, "The trade was made before I sold to Mr. Montgomery," is hardly susceptible of any other construction. In other words, Hundley had an option upon this stock at $5,750, and by paying that sum was entitled to the stock. From the admissions we have no hesitancy in saying that Hundley had an option on the stock. Does this make him such an owner as would bring him within the meaning of the rule of law first above discussed?

The term "option" has been thus defined: "A right of choice or election; sometimes applied to contracts whereby one purchases the right for a certain time, at his election, to demand and receive or to deliv-

er property at a stated price." [Cyclopedia Law Dictionary, p. 654.]

In Black v. Maddox, 104 Ga. 1. c. 162, the term is defined in this langauge: "The obligation, by which one binds himself to sell, and leaves it discretionary with the other party to buy, is what is termed in law an option, which is simply a contract by which the owner of property agrees with another person that he shall have the right to buy the property at a fixed price within a certain time."

When defendant admitted that he had an option, it will be presumed that it was a valid one and one enforceable at law or in equity. We use the word option in its legal sense and as distinguished from a mere offer to sell. This distinction is clearly drawn in Ide v. Leiser, 10 Mont. 5, where the cases are collated. In a case where there was a valid option upon stock, it has been held that equity will enforce the specific performance of the contract, which became a completed, valid and mutual contract by an acceptance of the offer contained in the option. [Watkins v. Robertson (Va.), 54 S. E. 33.]

It has likewise been held, in cases of options upon real estate, that even before the acceptance of the terms of the option, but during the life of the option, the offeree had an equitable title to the premises; that the offerer held the property in trust for the offeree, and the offeree held the price in trust for the offerer. [21 Am. and Eng. Ency. Law (2 Ed.) 933, 934, and cases cited. See, also, House v. Jackson, 24 Ore. 89; Railroad v. Spencer, 156 Pa. St. 85; Kerr v. Day, 14 Pa. St. 112.]

Many cases, including Mers v. Insurance Co., 68 Mo. 127, are to the contrary, and we think the doctrine of these last-mentioned cases is the better doctrine. Of course, if there has been an acceptance of the offer contained in the option, then we have a completed contract,

and the question presented would be a different one, but not one involved in the case at bar. The cases above mentioned are real estate options. All we have in the case under consideration is an admitted option upon personal property. We find no case declaring the interest of the offeree in such property prior to the acceptance. If defendant had a valid and subsisting option, which by his broad admission in the letter of May 28th, he must have had, and is presumed to have had, then he had a right to accept and perform the terms of the option, at which time his title to the stock would become complete. If the peculiar facts were such as would enlist the discretion of the chancellor he might have specific performance, but at all events he would have his remedy at law against the offerer, Shackelford, if there were a refusal to transfer the stock.

Defendant says the trade had been made with Shackelford before he sold to plaintiff. He no doubt meant by this that he had procured the option from Shackelford. The terms thereof, further than the stipulated price, do not appear.

Shackelford, in good faith, could not sell the property to another during the life of this option. During the period of this option, Shackelford had parted with his right to sell. [Ide v. Leiser, supra.] Under these circumstances this property was tied up, during the life of this option, in the hands of defendant. He could, by his word, dictate the course of the devolution of its title. When he sold it to plaintiff and had Shackelford transfer it direct to plaintiff, at his direction, it was equivalent to going to Shackelford and accepting the terms of the option, taking the transfer to himself, and then transferring it to plaintiff. To our mind this admitted option under the stock sold creates such a relationship between plaintiff and defendant as brings this case within the doctrine of law first announced in the course of this opinion. Defendant then admits that

he withheld the facts from plaintiff. Under such circumstances the plaintiff had a right to rescind the contract and recover the purchase price, and this too without proof of further misrepresentations. In such case, it is wholly immaterial whether or not actual damage was suffered. Such contracts contravene public policy, and had the stock been worth twice the amount paid for it, the right to rescind would yet exist.

III. The instruction given for the plaintiff presented the case to the jury upon the theory hereinabove discussed, and presented it as fairly as the defendant could ask. We have gone over the several instructions asked by defendant and refused by the court. If our views of the law of this case are correct, they were properly refused. There was substantial evidence from which the jury could find that defendant was plaintiff's agent and that he held an option on the stock. It therefore follows that the judgment should be affirmed, and it is so ordered.

All concur, except *Woodson, J.,* who tried the cause *nisi,* and does not sit herein.