FRANK B. WILLIAMS, Administrator of the Estate of JOSEPH BRENNEMAN, Deceased, Respondent, v. A. J. JOHNSTON, Appellant.

Springfield Court of Appeals, June 26, 1916.

1. **CONTRACTS: Ambiguity: Evidence.** Where a writing creates a relationship between two parties in an ambiguous manner it is open to evidence *aliunde.*

2. ———: **Principal and Agent: Purchase by Agent from Principal: Law Examines Closely.** Where the relation of principal and agent exists, the law scrutinizes closely purchases made by such agent from his principal when same are attacked, and before such purchases are allowed to stand the contract of agency must be terminated.

3. **PRINCIPAL AND AGENT: Agent Withholding Information: Benefiting Thereby: Illegality.** Where the relation of principal and agent exists and the agent finds out that there is a purchaser who will buy the principal's land at a given price, he will not be permitted to withhold that information from the principal and get the property in his hands and make such sale at an advantage to himself.

4. ———: **Unfair Advantage Taken by Agent: Remedy.** Where an agent has taken an unfair advantage of his principal, equity will compel him to disgorge the profits accruing therefrom.

5. ———: ———: **Liability of Agent.** The principal, an owner of land, was a man over eighty. He made an option contract for

the sale of said land with his agent, who secretly procured a purchase at a price less than that fixed in the option and purchased for himself, through a straw man, said property. He took undue and unfair advantage of his principal and was liable for the profits therefrom.

Appeal from Greene County Circuit Court. Division Number Two.—*Hon. Arch A. Johnson,* Judge.

AFFIRMED.

*Barbour & McDavid, Hiett & Scott* and *Lamar & Lamar* for appellant.

*Tatlow & Mitchell* and *Patterson & Patterson* for respondent.

FARRINGTON, J.—The petition in this case asked for an accounting and the cancellation of a note. The court rendered judgment for plaintiff in the sum of $6602. It was shown at the trial that the note had been cancelled and the mortgage securing it released of record. Joseph Brenneman instituted the suit but died before it was tried. An administrator was appointed who prosecuted the suit to judgment.

The facts developed show that sometime in the fall of 1912, Brenneman, a man over fourscore years of age, was the owner of two tracts of land in Christian county, one containing 880 acres, the other 1232 acres, and was also the owner of a 5 acre tract in Topeka, Kansas. The two tracts last mentioned are the ones principally involved in this litigation. Brenneman was indebted about $17,000; of this indebtedness $7700 was represented by notes secured by a mortgage on the 1232 acre tract, something over $3200 was secured by a mortgage on the 880 acre tract, and something over $2100 stood against the 5 acre tract; besides, he owed his brother $3600 which was secured by a mortgage made subsequent to those just mentioned which covered all the above land as well as some live stock owned by Brenneman. He was being pushed by his creditors and desired to make some disposition of his property so

as to liquidate his debts. He inquired of a banker at Ozark concerning some real estate agent to whom he could go to the end that he might make a sale of his property, and was referred to the defendant as a successful real estate broker. Brenneman thereupon went to Springfield and had a talk with defendant, and made further inquiry as to the defendant by going to the cashier of the Springfield bank by whom he was informed that Johnston was a reliable, trustworthy, real estate broker, well-to-do financially. After several conversations with the defendant he entered into the following writing:

"This contract, made and entered into this 14th day of February, 1913, by and between A. J. Johnston of Greene county, Missouri, and Joseph Brenneman of Christian county, Missouri.

"This is to certify that I have given option on my 1230 acres, located in Christian county, near Spokane Post Office.

"The said Joseph Brenneman agrees to give A. J. Johnston option on above-mentioned 1230 acres for twelve months from this date and Joseph Brenneman is to get $18 per acre net in case of sale and the said A. J. Johnston is to have all above this amount. In case said A. J. Johnston fails to sell in twelve months, this contract is void."

Between February 14, 1913, and April 28, 1913, Brenneman and defendant had a number of conversations from which the defendant knew that Brenneman was much worried about his debts and the condition his property was in, and that he was so involved he could not "turn a wheel."

On April 28, 1913, the following writing was signed by the parties—which was abandoned and never carried out:

"This April 28, 1913.

"Contract by and between A. J. Johnston and Joe Brenneman.

"This is to certify that said Brenneman is giving his Topeka, Kansas, property 6 acres subject to $1600 on 10th Street and giving 1232 acre ranch in Christian

county subject to $7000 mortgages and said Brenneman reserves this year crop the said Brenneman will give the above property for 100 feet on West Commercial St. subject to mortgage $2250 and on Bungalow subject to 700 mortgage and 8 room house on Memphis St. subject to 1200 mortgage and 6 room house and 2 large lots in Willow Springs the Willow Springs property to be free and clear the said Joe Brenneman has this day signed this contract and will close deal on the above contract that is it is understood by this contract if said A. J. Johnston puts up the above property the deal is closed.''

It will be observed that the last clause of that agreement leaves the question of a trade open so far as the defendant is concerned.

On May 5, 1913, another contract was entered into modifying and enlarging the contract of April 28th, and it specifically relieves the defendant of any obligation to purchase or trade for Brenneman's property by the following clause: ''The said A. J. Johnston agrees to comply with above contract if his deals go through satisfactory to him.''

On May 3, 1913, before Johnston had in any way bound himself to take Brenneman's property, he closed a contract with one Pollock agreeing to sell him Brenneman's 1232 acre tract for $12.50 an acre. Seven days later, on May 10th, Johnston closed the following contract with Brenneman:

''Springfield, Mo., May 10, 1913.

''Contract by and between A. J. Johnston and Joe Brenneman.

''This is to certify that A. J. Johnston is giving said Joe Brenneman, is making a trade A. J. Johnston is giving said Brenneman 520 acres free and clear of debt located in Oklahoma, near Stanley, Oklahoma, and Johnston is to give said Brenneman $3600 cash to boot and said Brenneman is giving A. J. Johnston 1232 acres Christian county subject to mortgage of $7000 and 5 acres in Topeka, Kansas, subject to $1600 and said A. J. Johnston has this day paid said Brenneman 50 cash to bind deal.''

It is admitted that Johnston never told Brenneman that he was selling his 1232 acre tract to Pollock for $12.50 an acre or for any other sum, and that he purchased the property through "straw men" to whom the 1232 acre tract and the 5 acre tract were deeded although in fact Johnston was the real purchaser who was getting Brenneman's property.

The net result of the trades and negotiations carried on between Brenneman and Johnston is that Brenneman had some equities which were worth (and which actually brought on sales) $6602; Johnston obtained these equities and realized from them the sum of $6602; Brenneman, in return, got from his deals with Johnston some pieces of property, which, after allowing for encumbrances that stood against them, were worth absolutely nothing

The theory on which the trial court decided this case was that there existed such a confidential relationship between these men that the law would not permit Johnston to retain this money, and in the judgment rendered we fully concur.

The defendant contends that there never existed between himself and Brenneman the relation of principal and agent after signing the contract of February 14, 1913; that it was an option to purchase only.

While such contract might have permitted Johnston to buy the 1232 acres provided he paid Brenneman $18 per acre, yet the language of the writing clearly contemplates a sale of such property by Johnston for Brenneman to some one else. If such contract did not contemplate a sale of the property to some one besides himself, why the provision that "said A. J. Johnston is to have all above this amount. In case said A. J. Johnston fails to sell in twelve months, this contract is void?" The most that can be said of the writing is that the relation that it created was ambiguously expressed, which throws it open to evidence *aliunde*. [Paramore v. Campbell, 245 Mo. 287, 149 S. W. 6.]

What is this evidence? That Brenneman was inquiring for a real estate agent for the purpose of selling his properties. He was directed to Johnston.

He found him and disclosed his real condition. He inquired concerning the integrity and honesty of Johnston, a matter one is much more careful about in finding an agent than he is in finding a purchaser. He took Johnston's advice from first to last—and there is no evidence that he ever failed to sign any paper that Johnston asked him to sign. Johnston was giving him advice about his trading; told him that he traded too often—strange advice for a purchaser to give a vendor; and it will be noticed also that in no writing or contract that Johnston had him sign did Johnston bind himself to be the purchaser of Brenneman's land until he (Johnston) had closed a contract with Pollock for the absolute sale of Brenneman's land. No one reading the record before us can draw any other legitimate conclusion than that Johnston was acting in a position as Brenneman's agent, at least until April 28th when he did have Brenneman sign a contract whereby Johnston would become the purchaser of the land, but it is significant that in that contract by which Brenneman was bound to do certain things as a seller to Johnston, the latter was bound to do nothing as a purchaser from Brenneman; and so with the contract of May 5th. These two contracts, however, were never consummated. Yet the contract of February 14th, which was one of agency, was still in force, and after the contracts of April 28th and May 5th fell through, and while the contract of agency of February 14th was in force, Johnston secretly and circuitously acquired the property of Brenneman on May 10th, and then only after he had secretly made a contract to sell the property to Pollock as his property seven days before, or on May 3d.

Undoubtedly, as appellant argues, it is not impossible for one who is an agent to afterwards become a purchaser from his former principal; but the law will look with scrutinizing eye upon such transactions when attacked and will at least see to it that before such purchases are allowed to stand the contract of agency is terminated. In this case the contract of agency was never terminated by any agreement, if at all, except

that of May 10th, and as to that contract it is admitted by the defendant that before making it and while his agency continued he had sold Brenneman's property to Pollock never having divulged the fact to Brenneman; and it is further admitted that he got Brenneman's property through a "straw man." Such trades cannot be upheld. We find the law applicable to this case stated in Connor v. Black, 119 Mo. l. c. 134, 24 S. W. 184, as follows: "The law is, that a broker or commission merchant has no right to buy from, or sell to his principal, without his knowledge and consent, and that in such case the fact that the price paid was the fair market value, and that the transaction was a fair one and free from fraud or any undue advantage, is no legal justification or excuse. They could not occupy the dual relation as agent and principal at the same time, without the knowledge and consent of those for whom they were acting. Such contracts are said to be absolutely void as against public policy." [See, also: Euneau v. Rieger, 105 Mo. 659, 16 S. W. 854; Montgomery v. Hundley, 205 Mo. 138, 103 S. W. 527.]

The property which Johnston claims to have traded to Brenneman, at arm's length, was of no value whatever; Johnston and his witnesses do not seriously contend that it was.

"Dealing at arm's length" has a meaning that even the wayfarer will recognize. It does not mean to use one arm in the capacity of a protecting agency and the other to reap the benefits due the strong-armed purchaser. St. Matthew was speaking of alms, not agency, when he wrote, "let not thy left hand know what thy right hand doeth."

The trial court, hearing the testimony first hand, found that Brenneman was over eighty years of age and of such feeble mentality as to be easily imposed upon. There is much testimony in the record to uphold such finding; but the theory on which we dispose of the case is that Johnston while Brenneman's agent made a profit out of the agency by secretly buying and selling the property of his principal, and we only mention such finding and evidence as a stronger reason in this

case for the application of the rule that an agent acting as such who finds out that there is a purchaser who will buy the principal's land at a given price will not be permitted to withhold that information from his principal and secretly get the property in his hands and make such sale at an advantage to himself. If he does, law and equity would be of small avail as instruments in bringing about justice unless they required him to account for such profits. An agent will not be allowed, while an agent (and such was, Johnston when he closed the contract with Pollock on May 3d), to lay the foundation for future advantage at the expense of his principal. [Dennison & Co. v. Aldrich, 114 Mo. App. l. c. 709, 91 S. W. 1024.] The contract of May 10th was only an instrument by which Johnston was carrying out his plan to get his principal's property knowing at the time that he already had the land sold to Pollock. Such contract was no settlement or compromise nor any transaction that required a suit to set the writing aside before suit for an accounting could be brought. The property was sold to innocent purchasers. To rescind as to them would be a fruitless undertaking. All that is asked in this suit and all that was given by the trial court was the profit which Johnston made out of the property belonging to his principal, which property he had acquired and sold secretly at a profit to himself. The trial court required the defendant to account for this, and we concur in that judgment. *Robertson, P. J.,* and *Sturgis, J.,* concur.