H. B. VINING, Appellant, v. MO-LA OIL COMPANY.

Division Two, December 22, 1925.

1.  **CONTRACT OF SALE: Option: Cancellation: Agent's Commission.** A contract for the sale of oil lands which is not revokable at the will or caprice of either vendor or vendee, but is mutually obligatory and enforceable, is not an option contract, and the agent for the vendor who produced the purchasers cannot be denied his commissions merely because, without his knowledge or consent, it was later voluntarily cancelled by the mutual agreement of the vendor and the purchasers and another substituted in its stead.  If the agent for the vendor produces purchasers for the designated properties and they are accepted by the vendor and a binding contract for the sale of the properties is entered into between the vendor

and such purchasers, and it is subsequently cancelled without the agent's knowledge or consent, he is entitled to his commissions, whether or not the sale is consummated.

2. ———: Producing Cause: Final Consummation: Agent's Commissions. In an action by an agent for agreed commissions under a contract with the defendant vendor for the sale of oil leases, an instruction telling the jury that if plaintiff, pursuant to his written employment, "procured purchasers" and "defendant accepted said purchasers so procured and contracted with the said purchasers so procured by plaintiff, on terms made by defendant," their verdict should be for plaintiff, "even though the actual terms of the contract were negotiated between the defendant and the purchasers without the knowledge or assistance of the plaintiff" and "even though the entire purchase price was never paid," sufficiently required the jury to find that plaintiff was "the producing cause" of the sale out of which he claims commissions, and, there being evidence to support it, clearly submitted the issues.

3. ———: Abandonment: Substitution of Another Agent and Purchaser. Where plaintiff had in writing been authorized to sell two tracts, one of twenty acres and another of four hundred, at agreed prices and for agreed commissions for each, and the sale of the twenty-acre tract had been consummated through his efforts, an instruction that "under the evidence you cannot allow plaintiff any commission in the matter of the transaction affecting the 400-acre tract" is a demurrer to the evidence, and admits the truth of all evidence adduced by plaintiff and all reasonable inferences the jury may draw therefrom, and cannot properly be given unless it appears that the negotiations between purchasers produced by plaintiff were abandoned, and new negotiations, in which plaintiff had no part, resulted in the substitution of a different contract of sale. And where there was evidence that plaintiff produced Kaempf, who was so pleased with the terms offered by plaintiff for the purchase of both tracts that he inspected the properties and induced Benninger to go into the deal, and the negotiations between Kaempf and plaintiff were not broken off, but the vendor nevertheless secretly closed the deal and concealed it from plaintiff and entered into an agreement for the sale of the properties to a company of which both Kaempf and Benninger were owners, the court rightly, by proper instruction, submitted to the jury the question whether Benninger was the producing cause, and whether Kaempf, after inspecting the properties, was dissatisfied, and entered into new negotiations, in which plaintiff had no part.

4. ———: Cancellation: Commissions: Pro-Rata Payment. If the vendor, without the knowledge or consent of the authorized agent,

cancels the contract of sale to purchasers produced by the agent and accepted by the vendor, the agent is entitled to his commission, even if he had agreed to take it pro-rata as the purchase price was paid, and a part of it was never paid.

5. **INSTRUCTIONS: Covered by Others: Voluntary Withdrawal.** It is not error to refuse an instruction which is fully covered by others given. And where defendant has voluntarily withdrawn, by leave of court, instructions given and read to the jury, he cannot complain of the court's refusal of another instruction asked by him which was fully covered by those so given and withdrawn.

Appeal and Error, 3 C. J., Section 2626, p. 714, n. 76. Brokers, 9 C. J., Section 87, p. 596, n. 32, 33; Section 90, p. 603, n. 68; Section 97, p. 614, n. 20, 21; p. 615, n. 22, 23, 24, 25; Section 99, p. 619, n. 44; p. 620, n. 46; Section 102, p. 623 n. 65; p. 624, n. 66; Section 130, p. 661, n. 69. Contracts, 13 C. J., Section 643, p. 608, n. 45; Section 644, p. 609, n. 48. Trial, 38 Cyc., p. 1543, n. 68, 69; p. 1711, n. 19. Volenti Non Fit Injuria, 40 Cyc., p. 217, n. 76.

Appeal from Jackson Circuit Court.—*Hon. James H. Austin,* Judge.

REVERSED AND REMANDED *(with directions).*

*Dickinson & Hillman* for appellant.

(1) Plaintiff offered evidence of his contract of agency and that he procured purchasers for the property and introduced them to defendant's officers and that plaintiff continued in his efforts to induce said purchasers to buy both the twenty-acre property and the four hundred-acre property and that defendant accepted such purchasers and entered into a contract of sale of both properties of its own making and that it treated the transaction as a sale and that defendant voluntarily canceled such contract of sale without plaintiff's consent and entered into subsequent contracts of its own making with such purchasers and that defendant received between $118,818.79 and $123,818.77 on the purchase price and became indebted to the purchasers and repaid $13,000. Therefore the peremptory instructions in the nature of demurrers to the evidence were properly refused. Knisely v. Leathe, 256 Mo. 372, 178 S. W. 453; Lombard v. Sills, 170 Mo. App. 555; Morgan v. Keller, 194 Mo. 663. (2) There was no error in plaintiff's three instruc-

tions. Knisely v. Leathe, 256 Mo. 372, 178 S. W. 453; Lombard v. Sills, 170 Mo. App. 555; Morgan v. Keller, 194 Mo. 663; Ross v. Major, 178 Mo. App. 431. (3) Defendant's motion for a new trial should not have been sustained for errors in instructions requested by it because the errors, if any, were invited by defendant. R. S. 1919, secs. 1276, 1513; Cook v. Globe Printing Co., 227 Mo. 471; Vining v. Lippincott, 182 S. W. 758; Bank v. Ins. Co., 283 Mo. 336. (4) Defendant accepted the purchasers procured by plaintiff and the contract of December 11, 1919, was made by it. It was cancelled by the consent of defendant and without plaintiff's consent. It was an enforcible contract, not an option contract. Knisely v. Leathe, 256 Mo. 372; Lombard v. Sills, 170 Mo. App. 555; Morgan v. Keller, 194 Mo. 663.

*Henry S. Conrad* and *Caleb S. Monroe* for respondent.

(1) Defendant's instructions in the nature of a demurrer to plaintiff's evidence and in the nature of a demurrer to all the evidence should have been given. (a) The contract of December 11, 1919, and both the contracts dated February 9, 1920, are option contracts, and not contracts of sale, which plaintiff alleges he was employed to procure. Coal Co. v. Halderman, 254 Mo. 596; Glass v. Rowe, 103 Mo. 539; Zeidler v. Walker, 41 Mo. App. 118; Ramsey v. West, 31 Mo. App. 684. (b) A real estate agent, employed to make a sale, is not entitled to his commission for the procuring of a mere option contract. 9 C. J. (Brokers) 603; Zeidler v. Walker, 41 Mo. App. 118; Reiger v. Bigger, 29 Mo. App. 421; Ramsey v. West, 31 Mo. App. 676; Crowe v. Trickey, 204 U. S. 228. (c) The defendant, by entering into the option agreement, did not accept that as performance of plaintiff's undertaking to find a purchaser. Reiger v. Bigger, 29 Mo. App. 427. (2) Plaintiff's instructions are fatally defective in that they fail to require the jury to find that plaintiff was the procuring cause of the transactions

upon which he claims a commission. Russell v. Poor, 133 Mo. App. 728; Ramsey v. West, 31 Mo. App. 686; Law v. Paddock, 220 S. W. 969. And this defect is not cured by proper instructions given on behalf of defendant. Russell v. Poor, 133 Mo. App. 728; Law v. Paddock, 220 S. W. 969; Hall v. Coal Co., 260 Mo. 369. (3) Although plaintiff had negotiated with Igou and Kaempff as to the four hundred-acre tract, the fact that the contract was closed with them and others does not give him a right to a commission. Donaldson v. Houck, 213 Mo. 441; Dillard v. Field, 168 Mo. App. 206; Crain v. Miles, 154 Mo. App. 338; Ramsey v. West, 31 Mo. App. 676.

HIGBEE, C.—Plaintiff sued defendant for $17,500 and interest for commissions on sales of certain oil leases in Louisiana. A verdict for plaintiff for $19,832.08 was set aside on motion for new trial, on the ground that the court erred in giving and refusing instructions, and plaintiff appealed.

Plaintiff had an oral contract of agency with the defendant's treasurer, Mr. McClearn, who wrote plaintiff on August 13, 1919, confirming the terms of the oral contract, in substance, as follows:

"Mr. H. B. Vining.

"Dear Sir:

"Confirming our verbal conversation regarding commissions to be paid you for selling the following property in Louisiana through Mr. H. Lowerre or any other parties:

"You are to get a commission of $10,000 if you sell the Mo-La Oil Company 400 acres [here follows description] in Caddo Parish, provided said property is sold for $200,000. I also agree to pay you $3,000 commission on the sale of the Mo-La Oil Company half interest in 20 acres [here follows description] Caddo Parish, La., known as the Uncle Tom Lease, provided we get $40,000 for our half interest. If a sale is made of the Mo-La 8 acres [describing it] no commission will be

paid you.  If you sell any other properties of the Mo-La Oil Company I will pay you a fair commission.''

Vining testified that among others he found G. A. Igou and F. C. Kaempff, experienced oil producers, took them to defendant's office in Kansas City and introduced them to Mr. McClearn as prospective purchasers of both properties.  Shortly thereafter McClearn raised the prices of the properties and agreed to pay plaintiff a commission of $5,000 if he should procure a purchaser for the half interest in the lease of the twenty acres for $45,000, and $12,500 if he should procure a purchaser for the four hundred acres at $250,000.

Plaintiff got his information about these properties from McClearn, and gave Igou and Kaempff a statement of the amount of the production of oil.  Continuing, Vining testified that for a while during the fall of 1919, Igou and Kaempff felt they could not pay so high a price as was asked for the two properties and the deal was concentrated on the twenty acres.  They thought the four hundred-acre tract was too much, but they began to consider it again.  He kept after them and Mr. Kaempff said he would go and investigate the property.  Kaempff went to Louisiana early in January; the deal plaintiff had in mind when Kaempff went to Louisiana was for both properties.  Plaintiff did not know of an instrument or contract signed December 11, 1919, which had to do only with the twenty acres; plaintiff kept in close touch with the transaction as far as they would let him; he took sick and went to bed for several weeks soon after Kaempff went to Louisiana; McClearn avoided plaintiff and would not talk with him; this was after Kaempff returned from Louisiana, and plaintiff was not called into counsel for closing the purchase; he talked with Igou over the 'phone, but was too sick to get out; he learned in some way that the negotiations involving these properties had been reduced to contracts; Mr. Benninger was the Mo-La field man in Louisiana, but plaintiff had no contract with him; Kaempff was a stranger down there and plaintiff wanted Kaempff to go to

see Benninger; plaintiff interested Igou and Kaempff and their associates, meaning the people that went in with them, forming the Ajax Producing Company, and bought these properties; Vining believed McClearn, Igou, Kaempff and Benninger are the officers of the Ajax Producing Company; plaintiff had nothing to do with interesting Benninger in these properties more than having Kaempff look Benninger up, and McClearn was already interested in the property as the treasurer of the Mo-La Oil Company; McClearn took the matter out of plaintiff's hands as fast as he could; plaintiff talked to Kaempff about the transaction after he returned; there may have been a little period in which he did. not urge the sale of the four hundred acres, because they did not want to load up with so much, but later on they made some other financial arrangements and were ready to talk the four hundred acres, and when Kaempff went to Louisiana he was anxious to inspect the four hundred acres, which he did, and came back very much pleased and closed the contract for it; plaintiff was sick when it was closed, and when he got back to business he went right to McClearn and demanded his commissions in the amount of $17,500; that was before March 15, 1920; McClearn said they owed plaintiff the $5,000, but they did not owe him the commission on the $250,000, as plaintiff was not the procuring agent.

F. C. Kaempff testified that he and Igou knew nothing about these properties. Vining first brought a description of them in July, 1919; that he and Igou were interested in the purchase of the twenty and four hundred acres, but did not pay much attention till in September when he went with Vining to McClearn's office and talked about the twenty acres; he was trying to get the data from McClearn as to the runs; when they got together they took up the twenty acres; Vining had called his attention several times to the four hundred acres, which at that time was a little too high-priced and too much for them to carry. The first contract was made in December; they finally made a contract with the

Mo-La for $326,000; the consideration for the four hundred acres was $250,000.

G. A. Igou testified that Vining introduced him to McClearn; that he offered witness and Kaempff the twenty acres and the four hundred acres; the negotiations started in the latter part of 1919 and swung along until the first part of 1920; that he had not heard of the properties until Vining presented them and did not know who owned them; that they negotiated with him for the properties; that there was paid under the contract a little less than $100,000.

Caleb S. Monroe, attorney for the defendant since its organization in 1918 and secretary of the company at the time of the trial, testified: The first contract between the defendant and Igou and Kaempff bears date December 11, 1919, but was executed December 31, 1919, and deposited in escrow in the Central Exchange Bank; after that contract was executed new negotiations were started and a second contract was executed dated February 9, 1920, and the first contract was voluntarily canceled. The second contract was drawn after Igou and Kaempff and their associates had reached an agreement with the Mo-La Oil Company, and the contract embodies that agreement. At the time the contract of December 11, 1919, was executed and coincident therewith there was executed a contract by the Uncle Tom Oil & Gas Company and also a contract between the Uncle Tom Oil & Gas Company, Messrs. Igou and Kaempff and the Central Exchange National Bank, the three contracts being part of the same transaction. (Here the contract of December 11, 1919, plaintiff's Exhibit 3, was read in evidence). This is a contract between the Mo-La Oil Company, first party, and G. A. Igou and F. C. Kaempff, second parties. It recites, *inter alia,* that the second parties propose to organize a corporation under the name of Ajax Producing Company or some other appropriate name, with a capital stock of $2,000,000, divided into 2,000,000 shares, of the par value of one dollar each, for the purpose of acquiring an undivided one-half interest in an

oil and gas lease on the twenty acres held by defendant and its interest under a contract with Uncle Tom Oil & Gas Company, dated November 27, 1918. Now therefore, in consideration of the premises, etc., the first parties agree to execute in blank and deposit in escrow with the Central Exchange National Bank of Kansas City an assignment of its half interest in the oil and gas lease on said twenty acres, an assignment of its rights under said contract of November 27, 1918, with Uncle Tom Oil & Gas Company, with respect to drilling operations on said twenty acres, and a bill of sale of all personal property on said twenty acres. Said assignment and bill of sale shall be made in blank and second parties are authorized to fill in name of grantee upon delivery of said assignments. The second parties agree to organize a $2,000,000 corporation as above mentioned and sell or cause to be sold the stock thereof at not less than par and the proceeds of the sale of such stock, less a commission of not to exceed twenty per cent, to be deposited in said bank. Twenty-five per cent of moneys paid into the bank for stock sold shall be applied on the purchase price, $54,000, due first parties for the assignments and bill of sale above mentioned, and when such sum is paid to first parties by the bank it shall deliver said assignments and bill of sale to second parties or upon their written order. It is further provided that the first party shall remain in possession of and operate the property until the $54,000 is paid, and the net amount received by first party from oil runs during the term of this contract, less the expense of development and operation, shall be applied upon the sums due the first party. Then follows the escrow agreement with the bank which recites the foregoing contract, etc., and that unless all payments are made within the time designated, then this contract and the Uncle Tom contract and the Mo-La contract, copies of which are attached, shall be and become null and void, and the conveyances and assignments deposited in escrow shall be delivered to first party, and the certifi-

cates of stock and balance of the fund in the hands of the third party shall be delivered to second parties.

These documents are lengthy and elaborate, but the foregoing features are all we are concerned with. They are each marked "canceled" across the signatures, by agreement of all parties.

There were also deposited with the bank, as escrow agent, assignments of the twenty-acre lease and the bill of sale as stipulated in the contract of December 11, 1919, by which the Mo-La Company (quoting) "does hereby sell, transfer and deliver unto —————, represented by G. A. Igou and F. C. Kaempff."

Witness continued: On Kaempff's return from Louisiana there were further negotiations and a contract was entered into for the sale of the twenty and four hundred acres, as well as 2600 acres of undeveloped land owned by Benninger, and the contract, of December 11, was canceled by mutual agreement of all parties. This new contract, plaintiff's Exhibit 7, was produced by the witness, Caleb S. Monroe. It is in the same general terms as the contract of December 11, and is the contract relied on by the plaintiff. It bears date February 9, 1920. The Mo-La Oil Company is the first party, and G. A. Igou, F. C. Kaempff, M. McClearn, of Kansas City, Missouri, and S. W. Benninger of Shreveport, Louisiana, are the parties of the second part. It recites (a) that the first party is the owner and holder of certain oil, gas and mineral leases to and upon lands in Louisiana, and a certain contract with the Uncle Tom Oil & Gas Company, dated November 27, 1918; (b) that the second parties propose to organize a corporation under the name of Ajax Producing Company, or other appropriate name, with capital stock of $2,000,000, for the purpose of acquiring said property of the Mo-La Oil Company and other properties from the proceeds of the sale of stock in said corporation; that in consideration of the premises and of the mutual covenants, etc., it is agreed:

1. First party agrees to execute in blank and deposit in escrow with the Central Exchange National Bank of Kansas City, good and sufficient conveyances of the following property: (a) an undivided one-half interest in and to the oil and gas lease on the twenty acres (describing it); (b) all the rights of the Mo-La Oil Company under the contract of November 27, 1918, with the Uncle Tom Oil & Gas Company, with respect to drilling, etc.; (c) here follow several long descriptions which, it was agreed, covered the four hundred acres; (d) the eight-acre tract and (e) all personal property on above-described properties and leases. Said conveyances shall be in blank and second parties may fill in the name of said proposed corporation as grantee on delivery of said conveyances, pursuant to the terms of the contract.

2. Second parties agree: (a) to organize said proposed Ajax Producing Corporation with a capital stock of $2,000,000; (b) to deposit the stock in escrow with the Central Exchange National Bank to be issued and delivered as hereinafter provided; (c) to sell said stock at not less than par and deposit in said bank the proceeds of such sales, less a commission of not to exceed twenty per cent.

3-5. 350,000 shares of the stock shall be set aside for the purpose of paying first party for the above-described properties, and moneys paid to the bank from sale of such stock to be applied for that purpose.

6. The total purchase price to be paid the first party for the properties above described shall be $326,500, and when that sum is paid the bank is authorized to deliver the conveyances to second parties or upon their written order. Full payment is made a condition precedent to delivery of the conveyances.

8. This paragraph provides for monthly payments; the whole to be paid in four months.

9. The net amount received by first party from oil runs, less expense of development and operation, shall be credited on the purchase price of the properties.

The witness Monroe produced plaintiff's Exhibit 8, dated February 10, 1920, which he stated was an assignment by the Mo-La Oil Company of the four hundred acres and of its interest in the twenty acres. This was read in evidence. It recites: "does hereby bargain and sell, transfer, set over and deliver to ————, represented by G. A. Igou and F. C. Kaempff, duly authorized, an undivided one-half interest in and to that certain oil lease," etc. Here follow descriptions as contained in the contract of February 9. This contract, plaintiff's Exhibit 7, was canceled by mutual agreement of the parties by an entry across the signatures and signed by the parties.

Witness Monroe further testified that these contracts were adopted by the corporation; that during the negotiations leading up to the execution of the first contract on December 31, he repeatedly saw Mr. Vining holding conferences with McClearn, Parsons and other directors of the Mo-La Oil Company, and with Mr. Winger, attorney for the Uncle Tom Company, and at various conferences Mr. Vining was present, but witness did not know Vining's name nor his relation to the transaction; that Vining was at the Central Exchange Bank when the contract was executed; that some one informed witness that Vining was the real estate agent, and that was the first time witness knew the interest Vining had in the negotiations; that Vining had been industrious in all the negotiations leading up to the execution of the contract of December 31, affecting the twenty-acre tract, and after that time witness talked with McClearn about Vining as agent for the Mo-La Oil Company.

It is agreed that of the purchase price, $326,500, stipulated in this contract, $45,000 was for the twenty acres and $250,000 for the four hundred acres.

A contract, called an escrow agreement (defendant's Exhibit 3), to which this contract of February 9, 1920, was attached and deposited in the Central Exchange National Bank, was executed February 9, 1920, by the Uncle Tom Oil & Gas Company, the Mo-La Oil

Company, and S. W. Benninger of Shreveport, Louisiana, parties of the first part, and G. A. Igou, F. C. Kaempff and M. McClearn of Kansas City, Missouri, and S. W. Benninger, parties of the second part, and said bank as third party. It refers to a contract between the Mo-La Oil Company of February 9, 1920, with second parties, and a contract between S. W. Benninger and second parties of February 9, 1920. It recites that all conveyances mentioned in the Uncle Tom contract and in the Mo-La Oil and Benninger contracts have been delivered to the bank and that all the certificates of stock of the Ajax Producing Company have also been delivered to the bank. It is then provided that out of the sale of this stock as stipulated in the Uncle Tom and Mo-La contracts, ten per cent shall be set aside to maintain and pay overhead charges of the properties described in said contracts; that monthly statements shall be filed with the bank of expenses of operation and development of said properties, with the amount of revenue received from the production of oil. Of the remaining ninety per cent of moneys received from the sale of stock in the Ajax Producing Company there shall be paid $10,000 to the Mo-La Oil Company on the purchase price of the properties described in said Mo-La contract, and the residue shall be paid out as follows: twenty per cent to the Uncle Tom Oil & Gas Company, sixty per cent to the Mo-La Oil Company, and ten per cent to S. W. Benninger, all of which shall be credited on said several contracts; that the conveyances shall not be delivered until there has been $132,500 paid to the Uncle Tom Oil & Gas Company, $326,500 to the Mo-La Oil Company, and $100,000 to S. W. Benninger, in accordance with the terms of said contracts; that if full payments are not made within four months the said contracts shall become null and void.

The contracts (plaintiff's Exhibit 7 and defendant's Exhibit 3) were canceled March 15, 1920, by mutual consent of the parties thereto.

At the request of the defendant the witness Monroe produced and read in evidence defendant's Exhibits 4 and 5. Exhibit 4, dated February 9, 1920, witness testified was signed by the bank March 15, 1920, and copies delivered to the parties, taking the place of defendant's Exhibit 3, and all operations were held in abeyance until defendant's Exhibit 4 could be prepared and executed. Defendant's Exhibit 5 is dated January 3, 1921. Witness testified he had charge of these negotiations and never heard the four hundred acres mentioned until Kaempff went to Louisiana; that on his return Igou, Kaempff, Benninger and McClearn entered into negotiations with other officers and directors of the Mo-La Oil Company; that witness did not see Vining until the other contracts were executed, except the contract dated January 3, 1921; that $38,818.17 was paid by the bank to the Mo-La Oil Company; that otherwise than through the bank the Mo-La Oil Company and others interested received from Igou and Kaempff and their associates, the Ajax Producing Company, $80,000 or $85,000 on the $326,500, which must be reduced by $13,000 paid back to the Ajax Company; these payments were made under the contract of January 3, 1921. The entire purchase price has not been paid and the Mo-La Company is now in possession of the twenty and four hundred-acre tracts.

Defendant's Exhibit 5 is substantially in the same terms as plaintiff's Exhibit 7, except it provides that the first party, Mo-La Oil Company, agrees to assign in blank and deposit in escrow with the bank the stock certificates representing all of the capital stock of the Mo-La Oil Company instead of executing assignments or conveyances. It provides that $38,818.77 shall be paid Mo-La Oil Company in cash and the balance, $287,681.-23, in monthly installments of $15,000, beginning on January 10, 1921, until the whole of the $326,500, with interest, is paid. It stipulates that time is of the essence of the contract and that, in the event of failure to pay the Mo-La Company any installment, or interest when

due, or any item of cost of drilling, the contract shall become null and void, etc. It is further declared to be an option contract. Defendant's Exhibit 4 is an escrow agreement between the parties to defendant's Exhibit 3.

Referring to the contract of February 9, counsel for respondent in their statement of facts say: "The terms of the new agreement were very similar to those of the contract dated December 11 as to the deposit of assignments by the first parties, deposit of stock by the second parties, sale of stock by the second parties, payment of money to the bank and distribution by it to the first parties and delivery of the assignments in escrow upon the complete payment of the purchase price."

For the defense, McClearn testified he did not know Igou and Kaempff until Vining introduced them. A deal had already been started with the Uncle Tom and the Mo-La, and Vining came and said he could put the twenty acres in the deal; that three or four months after the letter (August 13, 1919) was written, Vining said he could sell it for $40,000 and that we ought to raise the price. Witness said if the price was advanced to $45,000 the commission would be raised to $5,000; that Vining never mentioned the four hundred acres to witness; the deal had already been' closed on the twenty acres. At the time the contract of December 11, 1919, was negotiated witness agreed to pay Vining $5,000 as the money came in; that Vining said, "Yes;" that witness had no other transaction with Vining with regard to this twenty-acre tract; that in March Vining asked when the Mo-La would pay his commission. Witness said the arrangement with you was to pay you *pro rata*. Witness said he would see Parsons, president of the Mo-La Company, if he would pay part of that money he had collected. Vining said he would not take it and then said, "You fellows owe me $12,500 on the four hundred acres, and I am going to get it if I have to sue you." Witness said that as far as that deal is concerned Mr. Benninger and witness made it, and the company

didn't give witness any right to give Mr. Vining a com-
mission, because it never was brought up; that the only
dealings with Mr. Vining about the four hundred-acre
tract was the letter of August 13, 1919; that Mr. Bennin-
ger was a stockholder in the Mo-La Oil Company and
field man for the company.

S. W. Benninger testified: Kaempff came to Shreve-
port in January, 1920; said he had taken over the
twenty acres and asked to see the properties; he may
have mentioned the four hundred acres. I told him I
had leases on 2600 acres; he said he would like to see
that; I asked $60,000 for it. After looking it over he
said if I would be a party with him in making a deal
with the Mo-La and be superintendent or manager of
the whole thing and put in my acreage, he would give
me $100,000 to help make the deal; that he would take
the four hundred acres, providing his people made ar-
rangements to sell the stock; that Igou and Kaempff and
his associates could handle the property, but if I would
not put in my acreage they wouldn't have anything to
show. I told him it would have to be taken up with Mr.
McClearn. I came to Kansas City; had several conver-
sations with Kaempff and Igou; they agreed if Mr. Mc-
Clearn and I would go in with the company and help it
they would try and make a deal on the property; the
consideration was that McClearn and I would go in and
be officers or something. We consented. Igou and
Kaempff agreed with the Mo-La Company that day. I
was afterwards vice-president and general manager of
the Ajax Producing Company, and field manager after
it took over the properties, but received no salary from
it; my salary came from the Mo-La Company; when
Kaempff came to see me in Louisiana he said nothing
about Vining, and did not mention the four hundred
acres, and I commenced to get him interested in it. I
put the 2600 acres into the Ajax Company at the price
of $100,000. No wells had been drilled on it; there are
eight wells on the four hundred acres; there were six
wells producing when they bought it; the eight wells

are producing about 150 to 200 barrels; McClearn and I were interested in selling the property.

The court overruled a demurrer to the evidence.

At the hearing of the motion for new trial, the court entered an order that if the plaintiff will enter a *remittitur* so as to reduce the verdict in favor of plaintiff to $5,500, the court will overrule the motion for new trial and in arrest of judgment and enter judgment for $5,-500; otherwise, the court will sustain the motions. Two days later this order was set aside, and the motion for new trial was sustained on the ground that the court erred in giving and refusing instructions. The motion in arrest of judgment was also sustained.

Respondent's brief contains a statement of the various points on which counsel insist the trial court erred in giving and refusing instructions. The logical way to consider this appeal is to discuss these contentions in their order.

I. The first contention is that the several contracts read in evidence are option contracts and not contracts of sale; that a real estate agent employed to make a sale is not entitled to a commission for the procuring of a mere option contract, and that the demurrer to the evidence should have been sustained. Counsel say: "No place in the contracts do the second parties agree to buy anything. No place do they agree to pay the first parties one dollar of their money. There is no personal obligation on their part to pay any consideration. There is no manner in which the first party can realize anything except by the sale of stock through the escrow holder. In the meantime the assignments deposited with the escrow holder are not effective and the control and right to the income from the properties remained unaltered."

Options.

In the contract of December 11, the defendant agreed to execute and deposit with the bank an assignment of the undivided one-half of the lease on the twenty acres, etc., and the second parties agreed to organize a corpo-

ration with $2,000,000 capital stock and deposit the cer-
tificate of stock in the bank, sell the stock and deposit
eighty per cent of the proceeds in the bank, out of which
the bank should pay first parties the purchase price.
Not only were the second parties personally obligated to
raise the purchase money by the sale of the stock, but the
stock itself was pledged with the bank to secure per-
formance of their undertaking. This contract was
executed by the first party by executing and depositing
the assignments and by the second parties by organizing
the corporation and depositing the shares of stock. It is
true that for failure of the second parties to make pay-
ments as stipulated, it is provided the contract would be
and become null and void. This was a provision for the
benefit of the Mo-La Oil Company which it could waive.

"Although no provision is made for notice, a stipula-
tion for forfeiture is not self-operative, but there must
be a declaration of forfeiture or some act or conduct
equivalent thereto." [13 C. J. 608, 609.]

The contract was not revocable at the mere will or
caprice of either party. "The party insisting on the
forfeiture must not be himself in default." [Ibid.] But
there is no question of compliance with this or the two
subsequent contracts of February 9, so the question of
the right of the first party to declare these contracts
null and void is not in the case. They were mutually
obligatory and enforceable; there is nothing optional
in their provisions.

Respondent's contention finds no support in Morgan
County Coal Co. v. Halderman, 254 Mo. 596, 163 S. W.
828. In the proposition to buy submitted to Mrs. Hal-
derman's agents there is this clause (p. 618): "Time
shall be the essence of this contract, and if said payments
are not made promptly as above stated, whatever may
have been paid by us shall be forfeited, and this con-
tract shall be null and void." Plaintiffs were not bound
to pay and it was held to be an optional contract. "Plain-
tiffs had the option to refuse to meet any payment and
as a penalty to lose what they had paid at any given time

and so render the writing null and void." [Page 636.] The cases are not analogous. An option contract is where one binds himself to sell and leaves it discretionary with the other party to buy. [Montgomery v. Hundley, 205 Mo. 138, syl. 5; 103 S. W. 527.]

Paragraph 6 of this contract of February 9, 1920, provides that the total purchase price to be paid the first party for the properties described shall be $326,500. Of this $45,000 was for the twenty-acre lease and $250,-000 for the four hundred acres. When this contract was executed the contract of December 11 was voluntarily canceled without the knowledge or consent of the plaintiff. And it is admitted that this second contract and the escrow agreement were held in abeyance at respondent's request and that both were canceled by mutual consent, without the knowledge or consent of plaintiff, by the third contract, dated February 9, 1920, and delivered March 15, 1920, by which the stock of the Mo-La Oil Company was sold in lieu of the corporate assets. So that if the plaintiff produced the purchasers for these two properties and they were accepted by the Mo-La Oil Company and a binding contract was entered into between the parties for their sale, the plaintiff became entitled to his commission whether the sale was consummated or not. [9 C. J. 595.] This conclusion has the sanction of the highest authority: the laborer is worthy of his hire. It is not contended by respondent that a voluntary cancellation of the contract would defeat plaintiff's right to the commission.

II. Respondent insists that plaintiff's instructions numbered 1-P, 2-P and 3-P "are fatally defective in that they fail to require the jury to find that plaintiff was the procuring cause of the transactions upon which he claims a commission." Eliminating descriptions, not material, these instructions read:

Producing Cause.

"1-P. The court instructs the jury that if you find and believe from the evidence that on or about August

13, 1919, the defendant employed plaintiff as its agent and agreed to pay the plaintiff a commission of $5,000 on the sale of the Mo-La Oil Company's interest in twenty acres known as Uncle Tom lease, at the price of $45,000, and to pay plaintiff $12,500 on the sale of Mo-La Oil Company's four hundred acres . . . at the price of $250,000, and that pursuant to said employment (if any) plaintiff procured purchasers for the above-described properties and defendant accepted the said purchasers so procured by plaintiff, if any, and that on or about February 9, 1920, defendant contracted with the said purchasers so procured by plaintiff, if any, on terms made by defendant for the above-described property at the said prices, your verdict will be for the plaintiff, and you will assess his damages at not to exceed $17,500; and if you further find from the evidence that plaintiff demanded payment thereof yon may add interest thereon at the rate of six per cent per annum from the date of said demand to this date.

"2-P. The court instructs the jury that if you find and believe from the evidence that the plaintiff Vining, under a contract with the defendant, did secure purchasers for the property of the defendant, and that the purchasers entered into a contract to buy the same, the plaintiff will be entitled to recover his commission even though the actual terms of the contract were negotiated between the defendant and the purchasers without the knowledge or assistance of the plaintiff, and even though you may find and believe from the evidence that the entire purchase price was never paid.

"3-P. The court instructs the jury that if you find and believe from the evidence that in pursuance of a contract with defendant plaintiff produced purchasers for the property of the defendant and the defendant dealt with said purchasers, and if you further find and believe from the evidence that later defendants by their acts and conduct treated such transaction as a sale of defendants' property, then your verdict will be for the plaintiff Vining."

We think the first instruction clearly required the jury to find that the plaintiff was the procuring cause of the sale before they could find for the plaintiff. In Ross v. Major, 178 Mo. App. 431, 163 S. W. 880, the instruction was that if the jury find the defendant agreed that "if he [the plaintiff] should secure a purchaser therefor [the forty acres] and a sale thereof was made to such purchaser, he would pay the plaintiff," etc. The court said, at page 442: "There is no magic in the words 'procuring and inducing cause.' · It is only essential that the instruction in some manner incorporate this principle as one of its parts; and any words conveying clearly this idea to the jury may be used. We think plaintiff's instructions were sufficient. The word 'secure' is used in these instructions. . . . There are numerous decisions in which instructions couched in different language but meaning the same have been upheld." [Citing many cases.]

The rule is very tersely stated in Knisely v. Leathe, 256 Mo. 341, syl. 5 (166 S. W. 257): "When an agent employed to procure a purchaser for lands has produced one with whom the owner enters into a valid and binding contract of sale, he is entitled to his commission, even though the purchaser prove to be unreliable and the owner refuse therefore to perform the contract of sale." See same case on second appeal, 178 S. W. 453 (9-10).

The instructions are wholly unlike those condemned in Law v. Paddock, 220 S. W. (Mo. App.) 969. In that case, Instruction 2 was that if the plaintiff was instrumental in sending John Haley to the defendant or in bringing defendant and Haley together for that purpose, they should find for plaintiff. Instruction 3 was to the effect that if the purchaser's attention was called to the farm through the instrumentality of the plaintiff whether directly or indirectly, etc. TRIMBLE, J., said, at page 971: "It is not sufficient for his act to be merely one of the links in a chain of causes; he must be the procuring cause. [Citing cases.] The instructions above set forth

present a very much wider latitude than the rule allows and, if they were approved, would permit a broker to recover commission on a sale with which he was only remotely connected, but which was not induced or procured by his efforts.''

The same rule is announced in Crain v. Miles, 154 Mo. App. 338, 134 S. W. 52; Dillard v. Field, 168 Mo. App. 206, 153 S. W. 532.

In 9 Corpus Juris, 614, it is said: ''In order that he [the broker] may be entitled to compensation on the consummation of a contract between the parties, it is not enough merely to put the customer on the track of property which the principal wishes to sell, or to put the principal on the track of a possible customer, but he must be the means of bringing the parties together, unless the principal refuses to complete the transaction after the terms are arranged by the broker. But it is not necessary that he should bring the customer into the presence of the principal or personally introduce them; it is sufficient that through his efforts the parties are brought into communication with each other, whereby their minds are brought together in an agreement. Where the parties are brought together as a result of the broker's efforts, and a sale, lease or exchange results, the broker becomes entitled to a commission, although he is not present during the negotiations following the introduction or takes no part therein.''

We have set out the objection made by respondent to these instructions. It is difficult to conceive how the issue could have been more clearly submitted to the jury. There was no error in giving these instructions.

III. Respondent assigns error in the refusal of Instruction 3-D which reads: ''The court instructs the jury that under the evidence in this case you cannot allow plaintiff any commission in the matter of the transaction mentioned in evidence affecting the four hundred-acre tract of the defendant Mo-La Company.''

Abandonment.

This is a demurrer to the evidence; it admits the truth of the evidence adduced by plaintiff and all reasonable inferences the jury might draw therefrom. Plaintiff's contract of agency for the sale of the four hundred acres is not questioned. It is established by the letter of August 13, 1919, and by all the evidence. Did the sale result directly or proximately from plaintiff's negotiations? If it appears from the evidence that the negotiations were dropped and thereafter Benninger intervened and induced the sale, then the instruction should have been given; otherwise, it should not.

From Benninger's testimony the jury could properly find that Kaempff was pleased with the terms offered by Vining for the four hundred acres, so much so that he induced Benninger to go into the deal; indeed, gave him a bonus of $40,000 to go in and take the management of the property; that the negotiations between Vining and Kaempff were not broken off and Benninger was not the procuring cause of bringing the parties into agreement. [Coffman v. Dyas Realty Co., 176 Mo. App. 692 (1), 159 S. W. 842.] The fact that defendant secretly closed the deal and concealed it from plaintiff does not affect plaintiff's right to recover. [Weidemeyer v. Woodrum, 168 Mo. App. 716, 720, 154 S. W. 894; 9 C. J. 619.]

Respondent's counsel say in their brief: "In any event, under the evidence the question whether or not the contract on the four hundred-acre tract was the result of the efforts of plaintiff should have been submitted to the jury. This defendant requested in Instructions 6-D and 17-D." The facts in Donaldson Bond & Stock Co. v. Houck, 213 Mo. l. c. 440, 112 S. W. 242, are unlike those in the instant case and the rule applied in that case is inapplicable here. In the Houck case, the court said, at page 441: "The early negotiations in which plaintiff took some part came to nothing and were abandoned to all intents and purposes. The testimony shows that plaintiff knew nothing of the formation of the last

purchasing syndicate. These facts present an impassable obstacle in the way of recovery.''

In the instant case there was only one corporation, the Ajax Producing Company. The assignments were executed to ————, represented by Igou and Kaempff. In the contract of February 9, it was stipulated: ''Said conveyances shall be in blank and second parties may fill in the name of the said proposed corporation as grantee on delivery of said conveyances pursuant to the terms of the contract.'' However, the question of the intervention of Benninger was submitted to the jury in Instruction 11-D; that if Kaempff went to Louisiana and after inspecting the property was dissatisfied therewith and entered upon new negotiations in which plaintiff took no part and which resulted in the contracts bearing date February 9, 1920, then the plaintiff is not entitled to recover a commission on the transaction pertaining to said four hundred-acre tract. The verdict of the jury under this and other like instructions eliminates from the case the claim that the negotiations were broken off and the deal was effected by the intervention of another party. The court did not err in refusing Instruction 3-D.

IV. Respondent assigns error in the refusal of its Instruction 13-D, that if the jury find it was agreed that plaintiff was to receive a commission of $5,000 on account of the sale of the twenty-acre tract for $45,000 and that the same was to be paid to the plaintiff *pro rata* as installments of said purchase price were received by the defendant, then you cannot allow any amount or sum to the plaintiff as a commission upon a sale of said tract, even though you may find from the evidence that the plaintiff was an efficient and procuring cause of the execution of the contracts whereby Igou and Kaempff obtained the right to purchase said twenty-acre tract. The Mo-La Oil Company, without the knowledge or consent of plaintiff, voluntarily canceled the first and second contracts and released the purchasers. Plaintiff was then entitled to

*Pro-Rata Payments.*

his commission, even if he had agreed to take it *pro rata* out of the payments. [Nesbitt v. Helser, 49 Mo. 383; 9 C. J. 596 and 623, and cases cited under paragraph 2.]

V. Instruction 6-D was covered by Instructions 7-D, 10-D and 11-D, and was properly refused.

VI. Complaint is made of the refusal of Instruction 17-D. This is a long instruction; the purport, however, is that, if the jury find Igou and Kaempff had no intention of purchasing the four hundred acres and after closing the deal for the twenty acres Kaempff went to Louisiana and was shown the four hundred acres by Benninger and upon his return he and Igou negotiated and executed a contract with the Mo-La Oil Company, giving Igou and Kaempff, McClearn and Benninger the right to buy the four hundred acres as well as the twenty acres, and that the act of Benninger was the procuring and inducing cause of the deal, then plaintiff was not entitled to a commission for the sale of the four hundred acres. This instruction was properly refused, because it was fully covered by Instructions 14-D and 15-D, given by the court. After these two instructions were read to the jury, defendant's counsel, by leave of court, over plaintiff's objections, voluntarily withdrew them. In such circumstances counsel cannot be heard to say the court erred in refusing 17-D. *Volenti non fit injuria.* Moreover, 17-D was also covered by Instructions 7-D, 10-D and 11-D.

Instructions: Voluntary Withdrawal.

There are one or two other assignments which are without merit. We are of the opinion that the learned trial court erred in sustaining the motions for new trial and in arrest. The judgment is, therefore, reversed and the cause remanded, with directions to reinstate the verdict and judgment. *Railey, C.,* not sitting.

PER CURIAM:—The foregoing opinion of HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.