[1] This action was filed in the Circuit Court of Laclede County, Missouri, August 28, 1948. Plaintiff seeks to recover $2,875, with interest and costs for commission alleged to be due from the defendant for selling 250 shares of stock in the Laclede Metal Products, Inc. The case was tried to a jury resulting in a verdict for the plaintiff in the sum of $2,875, plus interest in the amount of $200. From an order overruling a motion for new trial the defendant duly appeals to this court.
[2] Plaintiff's petition states that J. E. Boswell and wife owned 250 shares of common stock in the Laclede Metal Products, Inc.; that on December 1, 1947, J. E. Boswell employed plaintiff to sell said stock for a sum of $57,500, and agreed to pay him a 5% commission for his services; that on the ____ day of January, 1948, through the efforts of plaintiff, J. E. Boswell sold said stock to Pieper-Lillard, Inc. for the sum of $57,500. Plaintiff states that on January 7, 1948, he demanded of the defendant his commission of 5% for the sale of said stock and that defendant refused to pay same; that there is due plaintiff the sum of $2,875.
[3] The defendant, in his first amended answer, states that he advised plaintiff that he and his wife owned 250 shares of stock mentioned, by the entirety; that he would consult his wife, and if she agreed, he would sell their interest for cash in the sum of $57,500. The answer states that defendant had been negotiating with Pieper-Lillard, Inc. for the sale of said stock prior to any conversation with plaintiff, and that such sale was made by the defendant without any assistance from plaintiff. The answer admits that plaintiff demanded the commission, as stated in his petition, but denies that he owes any part thereof. He pleads that as a compromise to prevent litigation he offered plaintiff $676.22, in payment of alleged expenses of plaintiff brought about through defendant's original offer made to plaintiff if the property was sold as a cash sale. The answer further pleaded that plaintiff cannot recover *Page 126 
because he is not a licensed salesman or broker.
[4] Appellant relies upon two grounds of error assigned in his brief for reversal: first, that the verdict is against the evidence, against the weight of the evidence and against the law under the evidence; and, second, that the court erred in submitting plaintiff's Instruction No. 2, over the defendant's objection; that this instruction did not require the jury to find that plaintiff was the procuring cause of the sale. It is under the last assignment of error that appellant bases his sole contention for reversal.
[5] We here state such facts as we believe are necessary for the proper determination of the issues raised. The Laclede Metal Products, Inc., prior to December 1, 1947, was a corporation doing business in Laclede County, Missouri. The principal work of this corporation was the manufacture of anchors for Pieper-Lillard, Inc., a corporation of St. Louis, Missouri. J. E. Boswell and wife owned 250 shares of the stock, or 45% thereof, in the Laclede Metal Products, Inc. George Carr owned 45% of the stock and the plaintiff, Thomas D. Saunders, owned 10% of the stock. The ability of the Laclede Metal Products, Inc. to carry out its contracts depended upon the supply of steel, which, due to war conditions, became very scarce. The defendant testified that due to the steel shortage and financial difficulties the company was beginning to get in bad condition. He testified that "the future didn't look a bit good." This question was asked the defendant: "Q. Did you have occasion during that particular time to discuss with Tom Saunders the sale of your stock? A. Well, after a trip to St. Louis when we were seeking bank loans that were turned down, it looked like we was going to have to do something, so Tom came back from St. Louis, along in the fall, I guess the early part of the fall, and he was telling us about a party in Alabama, I believe, that had quite a good source of steel and, incidently, steel was one of our big problems too, and I told Tom, I said, `Tom, now, there is the steel and here is Pieper-Lillard, they have got a good product here, they are making a good profit on it, we are not doing any good.' I said, `now you can sell that stock to Pieper-Lillard, if you do I will give you 5% of what I make on the deal.'" Defendant testified that this conversation was made at his home one night early in the fall. The facts show that the defendant wrote Pieper-Lillard, Inc. near the end of November trying to sell this particular stock and he states that the letter was written after the proposition made to the plaintiff offering to employ him to sell the stock, but Pieper-Lillard refused to buy the stock. Shortly after defendant had written the letter trying to sell his stock Mr. Lillard came to the office of the Laclede Metal Products, Inc. to re-negotiate their contract with the company and in that meeting Mr. Carr, Mr. Lillard, plaintiff and defendant were present. Defendant asked Mr. Lillard why he didn't buy his stock in the company and offered to sell it for $57,500. Lillard stated that he was interested and would take the matter up with his directors. Now the defendant testified that a day or two after he had offered to sell his stock plaintiff asked him if the 5% deal was still on and that he told plaintiff that he had missed the boat, but that if he would get to work on the deal and put it across he would pay him 3%. Defendant testified that the original deal was 5% of the net profits and the 3% offered was also of the net profits. He testified that he actually did sell the stock for $57,500 and at the time of the sale he gave Mr. Saunders a check for $676.22.
[6] The plaintiff testified that around Thanksgiving, 1947, George Carr told him that defendant wanted to see him; that in pursuance to said information he went to the home of defendant, who told him he wanted to sell his stock for $60,000, and that he wanted plaintiff to promote the sale. The commission defendant offered was 5% and plaintiff testified that there was nothing said about 5% of the net profits. Plaintiff testified as follows:
[7] "Q. Now, at that time and in that discussion that you had there, did you discuss or suggest to Mr. Boswell that the Pieper-Lillard Company might be a potential buyer? A. I did; I told him I would talk *Page 127 
to Pieper-Lillard, and he suggested that I write them."
[8] Plaintiff testified that at said time and place they also discussed a company in Alabama. He stated that the next day he had to go to St. Joseph, Missouri to the funeral of his Aunt and that he was away for possibly a week; that after he returned to Lebanon he found that defendant had written a letter to Pieper-Lillard and had received an answer that they were not interested in the stock. Plaintiff testified that he then again discussed the sale of the stock with defendant; that a week or so later Mr. Lillard came to Lebanon, which was about two days after he returned from the funeral of his Aunt. The purpose of Mr. Lillard's visit to Lebanon was to re-negotiate a contract for anchors. Plaintiff testified that while in the office with Mr. Carr, Mr. Boswell, Mr. Lillard and himself Boswell proposed to Lillard that it would be a good idea for him to buy Boswell's stock and that Lillard said he did not have that kind of money for investment. Plaintiff testified that he went on trying to sell the Boswell stock after the defendant had been turned down twice himself; that on the day Mr. Boswell proposed selling his stock to Lillard, plaintiff, Mr. Carr and Mr. Lillard had lunch together at the Nelson Hotel; that he there discussed the merits of the company with Mr. Lillard in order to interest him in this stock. Boswell was not present at this time. plaintiff testified that at that meeting Lillard told him that he would ask Boswell what he would take for the stock and go back to St. Louis and talk it over with his associates and let him know later. Plaintiff stated that he was present later when Boswell, the defendant, offered to sell the stock for $57,500; that there was nothing said at that time about take it or leave it. Plaintiff further testified that Lillard called him after he went back to St. Louis and told him they were interested in the Boswell stock, but they were not interested in having a minority of the stock in the company; that they would be interested only if he could work up something whereby they would be able to dominate the company or direct its policy. Plaintiff stated that he thereafter began to work out such a plan; that he made approximately 7 to 10 trips to St. Louis to work out this sale; that he employed Mr. Fields, an attorney, to assist in working out the agreement and Mr. Boswell paid the attorney that he had employed for him; that he took the attorney to St. Louis twice; that he was solely handling the interest of the defendant; that Mr. Boswell did not go on any of the 7 to 10 trips, but that he went each time. Plaintiff testified that he finally got the deal worked out and sold the stock for $57,500, on the terms and conditions that Mr. Boswell wanted. The stock was sold for one-half cash and one-half deferred payment for one year. Plaintiff testified that he had Mr. Fields, the attorney, prepare the agreement; that there was some argument about the interest. Boswell wanted 6% on the balance. The Pieper-Lillard company wanted to pay only 4%. Plaintiff stated that he had to go back and forth to Boswell in order to get his consent to the terms offerred by the St. Louis corporation; that Boswell took no part in the completion of this transaction; that the transaction was finally consummated and the money paid over in the office of Mr. Fields, the attorney. Plaintiff stated that he was there and made the arrangements for the meeting and saw Mr. Lillard pay the money to Mr Boswell. The check was for $28,750. Plaintiff testified that in order to carry out this agreement he had to make arrangements with Mr. Carr to lease his stock so that the St. Louis corporation, purchasing the defendant's stock, would have controlling interest; that he got no compensation for his work from the defendant. Plaintiff testified that the defendant handed him a check wrapped up in a piece of paper and left the office before plaintiff found what it was; that the check was $676.22.
[9] The evidence is undisputed that the transaction was solely handled by the plaintiff in this case; that the defendant went with the plaintiff on one trip to St. Louis but admits that he did no talking, that the plaintiff carried on all the conversation relative to the handling of this sale. Defendant does not deny that the plaintiff employed an attorney to carry out the *Page 128 
transaction and he did not deny that he offered the plaintiff 5% commission to sell his stock for $60,000, but he does say he was offering 5% of the net profits. The defendant does not deny that all the details of the transaction were handled by plaintiff. The testimony did indicate that defendant's profit on the stock sold was approximately $22,500. Plaintiff testified that on January 7th, or 8th, he demanded 5% of the sale price of the stock and that defendant refused to pay him. Plaintiff's testimony was coroborated by witness Carr, who owned 45% of the stock in the Laclede Metal Products, Inc., and by the purchaser, Mr. Lillard, who details much of the transaction as being had with plaintiff. The facts further show that at the time the sale was being made, the plaintiff was the general manager of the Laclede Metal Products, Inc. and was receiving a salary from the company.
[10] Appellant's first assignment of error under Points and Authorities is that the verdict is against the evidence, against the weight of the evidence and against the law under the evidence. We hold that this assignment presents nothing to this court for review. In Martin v. Bulgin, Mo.App., 111 S.W.2d 963, 964, the court made the following statement: "It may be seen that there are four reasons set out in the above assignment of error, as follows: (1) The verdict is against the evidence; (2) the verdict is against the weight of the evidence; (3) the verdict is against the law under the evidence; and (4) there is no evidence to support or sustain the verdict.
[11] "Our Supreme Court has recently held that an assignment such as set out in the first three subdivisions above presents nothing for review in an appellate court. Following the holding in that case, we so hold here, and for the reasons given by the Supreme Court. Clay v. Owen, 338 Mo. 1061, 93 S.W.2d 914, 915, and the cases there cited." This law is so well settled in Missouri that it is needless to cite the numerous cases so holding.
[12] The second error, which is the one relied upon by appellant for reversal is that the court erred in submitting plaintiff's Instruction No. 2, over defendant's objection; that this instruction did not require the jury to find that the plaintiff was the procuring cause of the sale. In Low v. Paddock, Mo.App., 220 S.W. 969, 971, the rule of law governing brokers' right to recover a commission is properly declared as follows: "These instructions were erroneous. Russell v. Poor, 133 Mo.App. 723, 728, 729, 119 S.W. 433. It is well settled that, before the broker is entitled to recover, he must be the procuring cause of that for which he is employed. It is not sufficient for his act to be merely one of the links in a chain of causes; he must be the procuring or inducing cause. Ramsey v. West, 31 Mo.App. 676, 687; Gerhart Real Estate Co. v. Marjorie Real Estate Co., 144 Mo. App. 620, 625, 129 S.W. 419. The instructions above set forth present a very much wider latitute than the rule allows and, if they were approved, would permit a broker to recover commission on a sale with which he was only remotely connected, but which was not induced or procured by his efforts. * * *"
[13] In Vigeant v. Fidelity Nat. Bank Trust Co., 236 Mo.App. 774, 158 S.W.2d 184, 189, the court states the law as follows: "It is well settled that, before the broker is entitled to recover, he must be the procuring cause of that for which he is employed. It is not sufficient for his act to be merely one of the links in a chain of causes he must be the procuring or inducing cause."
[14] The same law is declared in Henning v. Holbrook-Blackwelder Real Estate Trust Co., 218 Mo.App. 433, 277 S.W. 62; Buhrmester v. Independent Plumbing Heating Supply Co., Mo.App., 151 S.W.2d 509; Mason v. James M. Carpenter Realty Co., Mo.App., 179 S.W. 945. So, there is no dispute as to the correctness of the law. The question then, is, did Instruction No. 2 follow the law as above declared. The instruction reads as follows: "The Court instructs the jury that if you find and believe from the evidence that the plaintiff was the inducing or procuring cause of the sale of the shares of stock mentioned in evidence at a price and on such terms as were satisfactory to the defendant, and that the *Page 129 
defendant had theretofore orally contracted to pay plaintiff a commission of 5% on the sale price of said stock if plaintiff was the inducing or procuring cause of sale, then the plaintiff is entitled to recover even though the jury may further find that the defendant himself first wrote Pieper-Lillard, Inc., suggesting that it buy said stock."
[15] We submit that this instruction does require the jury to find that plaintiff was the inducing or procuring cause of the sale of shares of stock.
[16] After the giving of this instruction the court also gave three other instructions bearing upon the same proposition of law. Instruction No. 1, given by the court, reads as follows:
[17] "The Court instructs the jury that if you find and believe from the evidence that in November, 1947, the plaintiff and defendant entered into a verbal agreement whereby the defendant was to pay to the plaintiff a commission of 5% on the sale price if the plaintiff brought about the sale at a desirable sum and price of 250 shares of stock held by the defendant and his wife in the company referred to in evidence as Laclede Metal Products, Inc., and if you further find from the evidence that in pursuance of such agreement, if any, the plaintiff was the inducing or procuring cause of the sale of said stock at a sale price of $57,500, and if you further find from the evidence that said price and terms of said sale were satisfactory to the defendant and that the plaintiff thereafter on January 7, 1948, demanded of the defendant payment to plaintiff of 5% of said purchase price as commission, then your verdict must be for the plaintiff in the sum of $2,875, plus interest thereon at the rate of 6% per annum from January 7, 1948."
[18] Instruction No. 3, given by the court, reads as follows: "The Court further instructs the jury that by the use of the term `inducing or procuring cause' is meant that cause originating or setting in motion a series of events which, without break in their continuity and in natural sequence, resulted in the accomplishment of the sale."
[19] Instruction No. 4, given by the court, reads as follows: "The Court instructs the jury that the burden of proof is on the plaintiff to establish by a preponderance of the evidence that the plaintiff was the efficient and procuring or producing cause of the sale by defendant to Pieper-Lillard, Inc., and unless you find that the plaintiff was the efficient and procuring or producing cause of such sale your verdict must be for the defendant and against the plaintiff. In this connection the Court further instructs you that plaintiff cannot recover if you find that plaintiff's acts were merely one of a chain of causes producing said sale or contributing in some degree thereto unless you also find that said acts of plaintiff were in themselves the efficient and procuring or producing cause thereof."
[20] We find that the court did not err in giving Instruction No. 2. This instruction follows the well settled law that the plaintiff must be the procuring or producing cause of the sale. And when the instructions given by the court are read together there can be no doubt that the court properly declared the law in the case.
[21] Judgment is affirmed.
[22] VANDEVENTER, P. J., and BLAIR, J., concur.