**W. C. HOLMAN d/b/a Holman Realty, Plaintiff-Respondent,**

**v.**

**Dale FINCHER and Arlene Fincher, his wife, Defendants-Appellants.**

**No. 8510.**

Springfield Court of Appeals.

Missouri.

May 10, 1966.

Low & Honssinger, Lebanon, for defendants-appellants.

J. W. Grossenheider, Lebanon, for plaintiff-respondent.

STONE, Presiding Judge.

In this jury-waived action at law to recover a broker's commission for sale of real estate, the court entered judgment for plaintiff W. C. Holman d/b/a Holman Realty and against defendants Dale Fincher and Arlene Fincher, in the principal sum of $2,000 with interest thereon from December 12, 1963. Defendants appeal.

About August 18, 1963, defendants listed their 287-acre farm for sale with two real estate brokers, to wit, with plaintiff under an *oral* listing agreement and with United Farm Agency (hereinafter called United) under a *written* listing agreement. Under the oral agreement with plaintiff, defendants were to receive the net sum of $45,000 and "anything over that" would constitute plaintiff's commission. The written agreement with United provided, inter alia, that the sale price of the farm was to be $50,000 and that, in the event of sale to a purchaser "procured through" United, a commission of ten per cent or $5,000 would be paid, with defendants thus receiving the net sum of $45,000. Neither agreement was exclusive.

During September 1963, Mr. and Mrs. O. R. Chambliss, then living on a farm in Texas, made a trip to Missouri with a view to purchasing a farm and moving here. The Chamblisses were looking for a relatively large farm on which to run cattle. On that trip to Missouri, they were in Lebanon and vicinity for about five days, apparently from September 20 to 24, and at different times during that period were shown farms by United's salesman Anderson and by plaintiff's son, Edward Holman, a licensed salesman for his father. On September 23, United's Anderson showed defendants' farm to the Chamblisses and introduced the parties. As Anderson stated, "they [the Chamblisses] liked the place but . . . wanted a larger farm." The Chamblisses questioned Anderson as to whether additional acreage might be obtained by purchase of a designated adjoining farm, and United's representatives were to investigate that possibility and communicate with the Chamblisses. Witness Beasley, Anderson's superior in charge of United's Lebanon office, testified that after September 23 the owner of the adjoining farm "was contacted and he did not wish to put the property up for sale at that time." When asked whether that information was communicated to the Chamblisses, Beasley's uncertain answer was, "I don't recall, I believe there was a letter written, I don't know . . . I would have to check." Mrs. Chambliss stated that "they never did . . . tell us about it." As for price, United's Anderson said that defendants' farm had been quoted to the Chamblisses at $50,000, and United's Beasley thought that "if it [price] had been discussed, which I am sure it was, it was quoted as $50,000." On the other hand, the Chamblisses testified that United had priced the farm to them at $52,500.

The only time which the Chamblisses spent with United's representatives was a portion of Monday, September 23 (Chambliss said "from 9:00 to 11:30 [A.M.], something like that," while United's Anderson thought it was "somewhere between 1:30 and 2:30 [P.M.] when I picked them up . . . and if I remember it was getting dark when I came back"), and defendants' farm was the only one shown by United. As Anderson said, "I think we drove by one other property, but didn't get out and look at it because it was too small." Upon trial, Chambliss indicated that he had not continued his search with Anderson because "I didn't feel like that he tried to answer my questions or show me and, if I asked him things . . . it didn't seem like he tried." In short, Chambliss thought that Anderson "just wasn't very accommodating."

Accordingly, the Chamblisses spent most of their time in the Lebanon area with plaintiff's son, who showed them one farm on September 20, three farms (including one south of Mt. Grove) on September 21, and "several other places" (including the 638-acre Manson farm east of Lebanon and a 400-acre farm west of that city) on September 23. On the morning of September 24, the Chamblisses told plaintiff's son that "there was no further need for looking at farms, that they were interested in one," namely, the 638-acre Manson farm. Later that day they departed for their home in Texas, leaving the son with the task of undertaking to negotiate an acceptable purchase agreement for the Manson farm.

After returning to Texas, the Chamblisses wrote *plaintiff's son* three times, to wit, on October 3 reiterating "that the Manson farm was the first choice," on October 8, and again on October 16, and they called him over long distance on October 18. The son, unsuccessfully "trying to secure the Manson place" and "also looking for other places . . . the type of places that he [Chambliss] liked," replied to the letters and answered the inquiries. The only letter written by the Chamblisses to *a United representative* was one dated October 16 to United's Beasley, in which the Chamblisses commented that they liked defendants' farm "but we think that it is just *to* high." To the inquiry upon trial as to whether he had answered that letter, Beasley said "I don't

remember, these records are in [our attorney's] office."

On December 7, 1963, Chambliss informed plaintiff's son over long distance that the Chamblisses were driving to Lebanon the following day; and, in response to the son's invitation, the Chamblisses came to his home on Sunday, December 8, and stayed overnight there. On December 9, plaintiff's son showed them a 500-acre farm west of Lebanon, an 1100-acre farm on the Gasconade River, and a farm east of Lebanon. On December 10, the Chamblisses submitted an offer on the Manson farm which was rejected. On December 11, they made an offer on the Woods farm and came "within $500" of purchasing it. Failing in that, plaintiff's son "persuaded them to go look at [defendants'] place" again. That was the first time *he* had shown defendants' farm to them, although, as he frankly stated upon trial, the Chamblisses theretofore had told him that they had seen the farm with United's representative.

When United had shown defendants' farm, the Chamblisses had voiced two serious objections, namely, (1) that the farm was too small for the herd of cattle they wanted to run on it and (2) that the price quoted by United was too high, by reason of which (so they insisted) United had not interested them in purchasing the farm. The evidence was that plaintiff's son induced the Chamblisses to purchase the farm by meeting and overcoming both of those objections. As for the size of the farm, he did "some figuring" with them and finally convinced them that "even though it [defendants' farm] was a smaller farm that the amount of pasture would handle more cattle than some of the larger ones"—that it "would produce as much as a much larger farm, due to the condition of the land." As for the price, plaintiff's son quoted the farm at $47,000, a substantially lower figure than that of $52,500 at which (so the Chamblisses testified) United had quoted it.

On December 12 plaintiff's son induced the Chamblisses to authorize him to make, on their behalf, an offer of $47,000 for defendants' farm and to deposit with him an earnest money check of $1,000, and on the same date defendants accepted that offer, all as manifested by a written "Offer and Acceptance" signed by O. R. Chambliss for the purchasers and by Dale Fincher for the owners, which upon trial was received in evidence without objection. In the "Acceptance" section of this exhibit, it was stated, over the signature of defendant Dale Fincher, that "the above offer is hereby accepted" and that *"we agree to pay agent's commission of $2,000."* (Emphasis ours) The sale was consummated shortly thereafter by defendants' conveyance of title and delivery of possession to the Chamblisses.

Before the sale was closed, United's representatives learned of the deal by "hearsay on the street" and contacted defendants. With both instant plaintiff and United claiming commissions, the situation eventually spawned three suits. In the *first* instituted in the Circuit Court of Laclede County by United against the Finchers (also defendants in the instant suit) on March 27, 1964, and docketed as *No. 5285,* United sought a commission of $4,700 under its *written* listing agreement. In the *second* instituted in the same circuit court by the Finchers against United and both of the Holmans (plaintiff in the instant suit and his son) on April 6, 1964, and docketed as *No. 5290,* the Finchers sought a declaratory judgment as to the rights and duties of the parties under the *written* listing agreement with United and the *oral* listing agreement with Holman and as to "which . . . under the correct construction of the aforesaid contracts" was entitled to a commission. The *third* was this case instituted in the same circuit court on September 24, 1964, and docketed as *No. 5441,* in which plaintiff Holman sought a commission of $2,000 under the *oral* listing agreement with him.

Prior to institution of this case, No. 5441, the Finchers unsuccessfully sought to consolidate Nos. 5285 and 5290; and, before trial of this case, they unsuccessfully moved

to add United as an additional party defendant herein. During trial of the instant case, the original files in Nos. 5285 and 5290 (both of which suits were pending and undetermined) were received in evidence as defendants' exhibits; and, on this appeal, those original files are brought to our attention in connection with defendants' lamentation that they "have fallen amongst the Philistines" and that, if the judgment for instant plaintiff be permitted to stand, defendants "could eventually be required to pay real estate commissions to two different brokers." But, in defendants' motion for new trial in the instant case, there was no reference to Nos. 5285 or 5290, or to the motions to consolidate those cases, or to the motion to add United as an additional party herein. In this state of the record, none of those matters are for our consideration, wholly apart from the serious question as to whether most of them properly could have been the subject of complaint in the motion for new trial in this case anyway. V.A.M.R. Rule 79.03; V.A.M.S. § 512.160 (1); Grapette Company v. Grapette Bottling Co., Mo.App., 286 S.W.2d 34, 36–37 (2, 3); Bybee v. Dixon, Mo.App., 380 S.W. 2d 539, 542(3, 4), and cases there cited.

Laying aside the hurrah's nest of pleadings and procedure, the only point in defendants'-appellants' brief, and thus the only point for our determination here [V.A. M.R. Rule 83.05(a); Pruellage v. De Seaton Corp., Mo., 380 S.W.2d 403, 405(3); Maxey v. General Electric Co., Mo.App., 382 S.W. 2d 67, 69(1)], is whether the trial court erred in holding "that plaintiff had met the burden of proof and . . . was the procuring cause of the sale of defendants' farm." In our consideration of this basic question, we are dependent upon defendants'-appellants' presentation and our own research, since plaintiff-respondent has filed no brief here, thus indulging a practice neither helpful nor commendable. Mannon v. Frick, 365 Mo. 1203, 1205, 295 S. W.2d 158, 161; M.F.A. Cooperative Ass'n. of Mansfield v. Murray, Mo.App., 365 S.W. 2d 279, 285. See Quinn v. St. Louis Public Service Co., Mo., 318 S.W.2d 316, 319.

The essence of defendants' argument is that United, not plaintiff, "first produced the buyers who ultimately purchased defendants' farm," and that therefore plaintiff could not have been the procuring cause of sale. In this, defendants are mistaken. A real estate broker need not be the first person to bring property to the attention of the purchasers to entitle the broker to a commission from the sellers.[1] While it is material and important to determine who first found or discovered the prospective purchasers, this is not conclusive. Warren v. Fritsch, Mo.App., 14 S.W. 2d 29, 30(3). It is entirely proper for the owners of real estate to place it in the hands of more than one broker for sale; and where this is done and a sale is made, the commission will, in the absence of a distinct contract to the contrary, belong to the agent whose efforts are the procuring cause of the sale, regardless of which one closes it.[2]

As our brethren of the bench in a sister jurisdiction have phrased it: "The simple meaning of this is that where agency to sell is given to more than one, a first approach and negotiation does not earmark a prospect as the exclusive customer of the introducing

1. Studt v. Leiweke, Mo.App., 100 S.W. 2d 30, 34(6); Gilchrist v. Stark, Mo. App., 41 S.W.2d 888, 891–892(2); Minter v. Rothschild, Mo.App., 186 S.W. 753, 755(1); Crain v. Miles, 154 Mo.App. 338, 344, 348–349, 134 S.W. 52, 53, 55 (5, 6); 12 C.J.S. Brokers § 91 b, p. 210. See Warren v. Fritsch, Mo.App., 14 S.W.2d 29, 30–31(3); Boswell v. Saunders, Mo.App., 224 S.W.2d 125, 128–129 (3); Glassman v. Fainberg, Mo.App., 35 S.W.2d 950, 953(5); Rowland v. Progressive Inv. Co., Mo.App., 202 S.W. 257, 259 (6).

2. F. H. & C. B. Gerhardt Real Estate Co. v. Marjorie Real Estate Co., 144 Mo.App. 620, 625, 129 S.W. 419, 420(4); Crain v. Miles, supra, 154 Mo.App. at 349, 134 S.W. at 55(5); Moseley-Comstock Realty Co. v. McClelland, Mo.App., 294 S.W. 103, 105, 106(6).

broker. By listing property for sale with others, each broker is warned that he is operating in a competitive field and in the absence of fraud or collusion to the victor will belong the spoils and whatever effort the loser has put into the race is lost to him." Reed v. Taylor, 78 Wyo. 216, 322 P.2d 147, 151. In more prosaic style, "the general doctrine" is thus stated in our Missouri cases: " 'While the broker who introduces the purchaser and who is instrumental in finding him is ordinarily the procuring cause of a sale, if several are employed the evidence must go further than merely to justify a finding that the purchaser was one to whose attention the property was brought by the broker's services. Of course, if the efforts of another broker were the primary, proximate and procuring cause of the sale, the broker originally employed is not entitled to his commission. A broker who is unsuccessful in effecting a sale does not become entitled to a commission upon the success of another broker.' " [3] Otherwise expressed, "[t]he broker is not entitled to commissions upon a transaction negotiated through the efforts of another broker without his aid or following his own unsuccessful efforts, even though he had found or first contacted the ultimate contracting party, showed him the property involved, or interested him in it, or had

provided the principal with such party's name." 12 Am.Jur.2d, Brokers, § 230, p. 973.[4]

■■ To permit recovery by a broker it is not sufficient that his acts constituted one or more links in a chain of causes contributing to produce the sale, but his acts must be the procuring or inducing cause of sale,[5] that is, the cause originating or setting in motion a series of events which, without a break in their continuity, result in accomplishment of the object of the broker's employment.[6] And the issue as to whether a broker has been the procuring cause of sale is ordinarily one of fact to be determined by the trier of the facts.[7]

■ Returning to the evidence in the case at bar, United introduced the Chamblisses to defendants and first showed their farm. However the Chamblisses "wanted a larger farm" and were not interested in defendants' farm at the price quoted by United's representatives unless additional adjoining acreage could be obtained. Being unable to arrange for that, United's representatives appear to have done nothing more. The Chamblisses obviously preferred to make further search in the Lebanon area with plaintiff's son, rather than with United's representatives; and it was only after

3. Warren v. Fritsch, supra, 14 S.W.2d at 31; United Farm Agency v. Cook, Mo. App., 283 S.W.2d 6, 11. See Crain v. Miles, supra, 154 Mo.App. at 349, 134 S.W. at 55(6); Atkinson v. S. L. Nusbaum & Co., 191 Va. 82, 59 S.E.2d 857, 861(8); 12 Am.Jur.2d, Brokers, § 223, p. 963; Id., § 230, p. 973. Consult also Taylor v. Vestal, Mo., 304 S.W.2d 820, 823–824; McIntyre v. Emmenegger, Mo. App., 355 S.W.2d 351, 354; Real Estate Enterprises v. Collins, Mo.App., 256 S.W. 2d 286, 289.

4. To the same effect, see 12 C.J.S., Brokers § 91, l. c. 209; Id., § 92, pp. 213–214. Consult also Kyle v. Kansas City Life Ins. Co., 356 Mo. 331, 336, 201 S.W.2d 912, 914(6); Gamble v. Grether, 108 Mo. App. 340, 83 S.W. 306.

5. Martin v. Mercantile Trust Co., Mo., 293 S.W.2d 319, 328(9); Vining v. Mo-

La Oil Co., 312 Mo. 30, 50, 278 S.W. 747, 753; Boswell v. Saunders, supra, 224 S.W.2d at 128(2); Williams v. Mashburn, Mo.App., 37 S.W.2d 478, 482(2); Low v. Paddock, Mo.App., 220 S.W. 969, 971(2).

6. Nichols v. Pendley, Mo.App., 331 S.W. 2d 673, 675(1); McIntyre v. Emmenegger, supra, 355 S.W.2d at 354; Rogers v. McCune, Mo.App., 283 S.W.2d 872, 877(6); Real Estate Enterprises v. Collins, supra, 256 S.W.2d at 289(3).

7. Barnum v. Hutchens Metal Products, Inc., Mo., 255 S.W.2d 807, 808(2); Blackburn-Ens, Inc. v. Roberts, Mo.App., 379 S.W.2d 630, 633; A. T. Earls Real Estate & Loan Co. v. Wise, Mo.App., 254 S.W.2d 677; Studt v. Leiweke, supra, 100 S.W.2d at 34(3); 12 Am.Jur.2d, Brokers, § 230, l. c. 974.

considerable time had been spent in working with and investigating for the Chamblisses, and after numerous farms had been shown to them and their offers for at least two had been rejected, that plaintiff's son persuaded them to look at defendants' farm again and then was able to convince them (as United's representatives had been unable to do) that it was suitable and sufficient for their intended use. So, this is *not* a situation in which United "had broken the ground, had sown the seed, had tilled the crop . . . had 'borne the burden and heat of the day' in working up to the sale [and] [n]othing remained but the harvest," as was the situation with which this court dealt in LeCompte v. Sanders, Mo.App., 229 S.W.2d 298, 301, extravagantly cited in instant defendants' brief as being on the facts "closely akin" to the case at bar. Rather the trial court reasonably could have found that United's representatives had done no more than simply to sow seed which did not germinate, and that the eventual harvest of sale was the result of timely reseeding with careful cultivation to maturity by plaintiff's son.

██ We have no doubt but that a submissible issue of fact was made as to whether plaintiff's son was the procuring cause of the sale. Bearing in mind that, in this court-tried case, "[t]he judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" [V.A.M.R. Rule 73.01(d); V.A.M.S. § 510.310(4)], we think the conclusion inescapable that the judgment for plaintiff should be affirmed.

Lest any of our comments be misconstrued, we hasten to point out that this appeal is determined upon the record before us and that, although its representatives testified upon trial, United is not a party to this action, so we do not here prejudge, or intend any expression of opinion with respect to, the issues in *No. 5285*, United's suit for a commission of $4,700 under its *written* listing agreement. See LeCompte v. Sanders, supra, 229 S.W.2d at 302; Studt v. Leiweke, Mo.App., 100 S.W.2d 30, 35(10).

The judgment for plaintiff is affirmed.

RUARK, J., not sitting.

HOGAN, J., concurs.