**MIDWEST REALTY COMPANY, a Corporation, Plaintiff,**

v.

**ALLIED SUPERMARKETS, INC., a Corporation, Defendant.**

No. 71 C 318(3).

United States District Court, E. D. Missouri, E. D.

March 30, 1972.

Blumenfeld, Kalishman, Marx & Tureen, St. Louis, Mo., for plaintiff.

Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for defendant.

## MEMORANDUM

WEBSTER, District Judge.

Plaintiff brings this action to recover commissions or compensation claimed to be due from defendant as a result of services alleged to have been performed by plaintiff on behalf of defendant in connection with a lease of defendant's property on South Lindbergh Boulevard in Sunset Hills, Missouri to Heritage House, Inc. Plaintiff is a Missouri corporation. Defendant is a Delaware corporation with its principal place of business outside Missouri. The amount in controversy exceeds $10,000 and this court has jurisdiction under Title 28 United States Code § 1332.

In October, 1970, defendant sold all but seven of its Bettendorf-Rapp Food Stores in the St. Louis area to Schnucks Markets. Ownership of the remaining seven was assigned October 10, 1970 to KMF, Inc., a subsidiary of defendant. From January, 1970 to July, 1971, Gerald J. Miller was real estate director for Bettendorf-Rapp Division of defendant. After the sale of the majority of its stores to Schnucks, defendant decided to dispose of the remaining stores by sale or lease. Signs were placed on the stores directing interested parties to contact Miller, who continued to function in the old real estate office of Bettendorf-Rapp.

Plaintiff Midwest Realty Company is a licensed real estate broker. Noel R. Essman was its principal shareholder. Essman is also in the construction business. In the Fall of 1970, he was working with Robert Lee Levine on a theater center project. Levine was branch manager of Motion Pictures Supply Company. Essman was investigating possible

real estate locations. It was contemplated that the developing group would take over an existing building which would be developed to house the theater and a restaurant and lounge which would complement the theater. Essman expected to do the remodeling work on the project.

Essman observed one of Miller's signs at defendant's store located in the 8000 block of Olive Street Road. On October 5, 1970, Essman called Miller and discussed the Olive Street store location with him. Essman testified that he asked Miller if the Olive Street Road store were available, if other locations were available and if defendant would pay a commission; that Miller answered "Yes" to all questions; and that Miller said it was not necessary to confirm it in writing, as he would make a note in his file. Essman further testified that he told Miller he was a broker representing Midwest Realty Company. After Miller supplied details with respect to the Olive Street location, he furnished information on other stores available for lease. Essman asked Miller if he would make himself available to show the Olive Street store, and Miller told him he would.

Miller's recollection of this conversation as detailed in his testimony differs in major part only in that he recalls Essman said he was a principal in a group interested in the property. Miller cannot recall if Essman said anything about brokerage. He recalled receiving numerous telephone inquiries about the properties at that time, and that his practice was to advise that he would pay a commission if the broker had a legitimate client with whom Allied had not worked. Allied gave no written listing contracts. Defendant was prepared to pay a commission for any person producing a client whom he represented and with whom Allied ultimately consummated a deal, assuming some assistance by the producing party.

Between October 10th and October 12th, Robert Levine contacted Leonard Lamberts of Heritage House at Springfield, Illinois. The telephone conversation took place in Levine's office with Essman present. Levine testified that he introduced Essman as his agent; that Levine was referred to James Jeffers, one of the officers and co-owner of Heritage House, who called him the next day; that Essman told Jeffers of his plan for a theater center, and that later, in a telephone conversation, Levine introduced Jeffers to Essman as his agent. Jeffers recalled the conversation differently. He testified that there was no indication that there was anyone but Levine on the telephone; that Levine wanted to discuss a potential combination venture consisting of the theater, restaurant and lounge with Heritage House to be a co-venturer. Levine referred to a location as a former grocery store located on Olive Boulevard in University City. Jeffers was aware of other Bettendorf locations at the time of the conversation. Prior to October, 1970, Jeffers had talked to Gordon McConnell, manager of Heritage House's North St. Louis' restaurant about a new location. They had been looking for a Crestwood location, including the area at South Lindbergh Boulevard and Highway 66 for about two years. Jeffers informed McConnell of his conversation with Levine.

A meeting took place November 5th in Levine's office with Levine, Jeffers and Essman. Jeffers testified that he was told that Essman was primarily an investor and builder in connection with the project and nothing was said about his being a broker or expecting a fee. Together they went to the Olive Street store location where they met Miller and looked over the property. While there, the subject of the South Lindbergh store location came up, but the parties differ as to the circumstances. Both Jeffers and Miller testified that Jeffers took Miller aside and asked him if he had a Sunset Hills location and told him he would like to drive by and get an impression of it. Jeffers testified he was skeptical about a combination venture and was interested in the Crestwood area and had seen a store available that deserved some attention. He testified that

he did not discuss this with Essman or Levine. Essman testified that he told Jeffers about another location at Sunset Hills and offered to show it to him that day—November 5th.

There was a second meeting November 9th at the Olive Street store with Lamberts and Capps, partners of Jeffers, also present. Jeffers' interest in the South Lindbergh property was discussed. Jeffers, Lamberts and Capps went to lunch and drove by the South Lindbergh store. The South Lindbergh store is located at the intersection of Lindbergh and Highway 66 in Sunset Hills, near Crestwood, Missouri. This location is in Southwest St. Louis County. The Olive Street location is in the University City area in Central St. Louis County, several miles distant.

Following the November 9th meeting, Jeffers received a telephone call from Levine about his interest in the Olive Street property. Another meeting took place November 17th or 18th at Levine's office. Essman, Levine, Jeffers and four other Heritage men participated. Miller was not present at this meeting. Essman was introduced as an investor and contractor. Prior to the meeting, Levine told Jeffers that Olive Street offered a better location than South Lindbergh. They went to the Olive Street store and met Miller, who opened the store. After lunch, Jeffers went to the South Lindbergh store and then to the Gravois store. Although Essman offered to go along, he was not taken on any of the occasions when Jeffers visited the South Lindbergh store. Having determined that he was interested in the South Lindbergh property in Sunset Hills, Jeffers so advised Miller and wrote him a confirming letter. He met with Miller thereafter several times at Miller's office. Sometime between November 9th and the first part of December, Jeffers advised Essman and Levine that Heritage House had decided to lease the Sunset Hills property.

Jeffers testified that Essman never asked to represent him as an agent or broker and that no fee or commission from Heritage House or Jeffers was ever discussed. The first time Jeffers knew that Essman was claiming a fee was when he received a letter from Essman in January or February, 1971. He testified that Essman never tried to interest him in the South Lindbergh store; that Essman suggested other locations as an associate of Mr. Levine; and that Levine tried to discourage him by saying that Sunset Hills was not as desirable as the Olive Street location because of many restaurants and theaters across the street. In a telephone conversation on or about November 20th, Jeffers indicated to Levine that he was not interested in a joint venture on Olive Street. Jeffers testified that he never discussed a joint venture on South Lindbergh with Levine or Essman. During the period he was dealing with Essman and Levine, he was shown one additional store by Levine which was not owned by defendant. He toured University City with Essman and looked at some vacant land on St. Charles Rock Road on or about the first part of February. Essman was still trying to promote a joint venture after knowledge that Heritage House was going to take the South Lindbergh property.

In January, 1971, Essman learned that a lease was being negotiated between Heritage House and defendant's subsidiary. He called Miller and told him that he was entitled to a commission. Miller replied that this was not up to him (Miller). On January 2, 1971, Essman wrote to Miller formalizing his claim and renewed his claim January 28, 1971. Defendant refused to pay. KMF, Inc. and Heritage House, Inc. entered into a lease agreement dated February 22, 1971 for the premises at 3612 South Lindbergh Boulevard. The lease was for 15 years at $60,000 per year.

Essman testified that he had been in the real estate business for fifteen years and that customary commission for negotiating a lease contract on real estate was five per cent of the gross rental for the first five years, four per cent for the next five years and three per

cent thereafter, payable upon execution. Essman testified that Miller told him at the November 5th meeting that Miller would protect him on commissions on all locations.

It is clear from the evidence that Essman and Levine were interested in developing a property as a joint venture which would include a theater, restaurant and lounge. They called the project "Tecca". The theater would enhance Levine's private business interests. Essman would expect to profit from any remodeling work. A company such as Heritage House would supply the restaurant and lounge. It is not unusual in such projects for one of the principals to have a real estate broker's license and thereby reduce the cost to himself or the group by negotiating a commission on the lease from a landlord otherwise willing to pay a commission. Under the facts and circumstances of this case, as summarized above, defendant would have been obligated to pay the customary commission to plaintiff had the co-venture materialized and had the Levine group leased the Olive Street store. The issue to be decided here is whether, under the facts and circumstances as they did occur, defendant became obligated to pay a similar commission when defendant leased its South Lindbergh store to Heritage House, Inc.

The court finds that defendant through Miller, who had authority to do so, offered to pay plaintiff a commission for procuring a tenant for any of the seven properties available for lease, including the South Lindbergh store. The same continuing offer was made to many other brokers on a non-exclusive basis. In the somewhat loose and wide-open manner in which Miller handled the disposition of these properties, the court finds that Miller was ready and willing to pay a commission to any person, whether or not a licensed broker who "procured" a tenant for the properties.

At no time during the period involved did Essman or plaintiff act as agent for Heritage House, Inc. Levine considered Essman to be his agent and the agent of the co-venture should it materialize.

■ The court finds by the preponderance of the credible evidence that Heritage House, Inc. developed an interest in the South Lindbergh property independently of Essman; that through its representatives Heritage House inspected the South Lindbergh property and negotiated a lease without the presence or assistance of Essman; and that Essman's group, if anything, attempted to discourage such negotiations in favor of an Olive Street or alternative location. The court further finds that all of plaintiff's efforts through Essman were directed at developing a theater center under a total entertainment center concept; and that at no time did plaintiff deal with, show or attempt to interest Heritage House in any properties other than for such purpose. Heritage House was interested in the South Lindbergh location purely for its own restaurant purposes and not as part of an entertainment center. Heritage House was never plaintiff's "legitimate client".

■ Among all the parties involved, only plaintiff was a licensed real estate broker. All of the discussions in the area of services to be performed and commissions to be paid were vague at best and ambiguous at worst. Plaintiff is not, however, in a position to claim either advantage or hardship as a result of such vagueness. Plaintiff sought out the defendant, made the inquiries with respect to the available properties and accepted the answers given to his questions about commissions to be paid. One who seeks to establish the terms of an implied contract has the burden of doing so by the preponderance of the evidence. Plaintiff has failed in its burden to show either a meeting of the minds or a legal detriment in reliance upon defendant's unilateral offer to pay a customary commission should plaintiff or anyone else "procure" a tenant for his property.

■ A broker is not entitled to recover a commission if his acts were merely one of a chain of causes produc-

ing a sale or contributing in some degree thereto unless his acts constituted the efficient and procuring cause thereof. Martin v. Mercantile Trust Company, 293 S.W.2d 319 (Mo.1956); Holman v. Finchner, 403 S.W.2d 245 (Mo.App. 1966).

 The court finds that plaintiff was neither the procuring nor inducing cause of the lease between defendant and Heritage House, Inc. The negotiations were prompted by the independent inquiry of Jeffers to Miller, an independent investigation and evaluation by Jeffers and negotiations between landlord and prospective tenant in which plaintiff in no way participated. Rogers v. McCune, 283 S.W.2d 872 (Mo.App.1955). It resulted in a lease for restaurant purposes. Plaintiff was promoting an entirely different project at a different location. Where a broker introduces a prospective purchaser to his principal for the purpose of inducing the prospect to buy or lease a specified property available for sale or lease which does not result in a deal, the broker has no claim to commission on the sale or lease of other property subsequently acquired by his prospect from the same principal. Duncan v. Hills, 155 Mo.App. 702, 135 S.W. 450 (1911); Tooker v. Duckworth, 107 Mo. App. 231, 80 S.W. 963 (1904); Dillard v. Field, 168 Mo.App. 206, 153 S.W. 532 (1913); Herb Tillman Co. v. Sissel, 348 S.W.2d 819 (Mo.App.1961).

The court cannot find from the evidence that defendant entered into secret negotiations with Heritage in order to foreclose a commission to which plaintiff would otherwise be entitled. E. A. Strout Realty Agency, Inc. v. McKelvy, 424 S.W. 2d 98 (Mo.App.1968), cited by plaintiff, is inapposite. In the instant case, no negotiations had commenced. Heritage had not agreed to form a co-venture with Levine and Essman, and there is nothing in the evidence to support the inference that Essman was ever authorized to negotiate with defendant on Heritage's behalf in connection with the Olive Street property. The total entertainment concept project on which Essman was working and in which he hoped to participate personally through the construction business and through plaintiff by contributing plaintiff's commission in exchange for equity simply never got off the ground. The court cannot read into Miller's agreement to pay a commission for "procuring a tenant" an implied contract to pay a commission on the lease of another property simply because Miller had been introduced to Heritage in connection with the Olive Street property.

The foregoing memorandum opinion constitutes the court's findings of fact and conclusions of law. The Clerk will enter judgment in favor of defendant. Costs will be assessed against plaintiff.

So ordered.