**FOLLMAN PROPERTIES COMPANY, Plaintiff,**

v.

**Thomas Francis DALY, Robert L. Nessen, Jack B. Sangunett, individually and as trustees of API Trust; Wilbur Rabinowitz, Allan Rabinowitz, Defendants.**

No. 84–0473C(3).

United States District Court, E.D. Missouri, E.D.

April 24, 1985.

As Amended May 24, 1985.

Myron Gollub, John A. Rava and Harry B. Wilson Jr., St. Louis, Mo., for plaintiff.

Gregory D. Hoffmann, Clayton, Mo., Joan Gregory and Frank Gulino, Carro, Spanbock, Fass, Geller, Kaster & Cuiffo, New York City, for defendants.

## MEMORANDUM

HUNGATE, District Judge.

Plaintiff, a real estate broker, brings this diversity action to recover $126,000.00 alleged owing to it by virtue of the sale of property listed with plaintiff by an entity known as API Trust. Plaintiff alleges that it is entitled to a six percent commission on the $2.1 million sale price, having procured the property's purchaser.

Defendants deny liability, and a nonjury trial was held on March 18, 1985.

### Findings of Fact

1. Burton E. Follman (Follman) is president of plaintiff Follman Properties Company, a licensed real estate broker. Plaintiff is a Missouri corporation with its principal place of business in the State of Missouri.

2. Thomas Daly (Daly) was at all relevant times the sole shareholder of API Trust (API), then a publicly held real estate investment trust which invested in commercial properties and mortgage portfolios. Defendants Thomas Francis Daly (Daly's father), Robert L. Nessen, and Jack B. Sangunett, all non-Missouri residents, were trustees of API. Steven Lieber was vice-president of API, and Jay Schapiro managed its daily operations.

3. In mid-1982, API acquired, as part of a ten-property transaction, warehouse property located in Berkeley, Missouri, which had as its tenant at that time Star Warehouse, Inc. (Star). Star was an affiliated company of the Chattanooga, Tennessee-based company of Cherokee Warehouses. At all relevant times, James D. Kennedy, III, and James E. McKenzie, Jr., were vice-presidents of Star.

4. The record titleholders of the Star property were defendants Allan and Wilbur Rabinowitz, both non-Missouri residents.

5. Daly made an appointment to meet with Follman while in St. Louis on other matters in July of 1982 to discuss general marketing conditions in the area. Star's lease was to expire within two years, and Follman had been recommended to Daly as a commercial broker.

6. On July 22, 1982, Follman and Daly toured the Star Warehouse property and discussed the possibility of leasing and/or selling the premises. Their meeting ended cordially, with Daly requesting that Follman send him a marketing proposal. On July 30, 1982, Follman wrote to Daly suggesting that the property be placed on the market for sale and that the possibility of leasing the property be pursued simultaneously.

7. In September of 1982, Daly agreed to a nonexclusive listing of the property with Follman Properties Company. Follman prepared the standard nonexclusive listing agreement which was eventually signed by Lieber on behalf of API and Follman on behalf of the plaintiff. The agreement listed a sale price of $4 million "or any other price ... to which Owner shall consent," with a six percent commission of the gross sale price if Follman Properties Company procured the buyer. The agreement also provided a commission schedule in the event of a lease.

8. Upon execution of the agreement, Follman took steps to market the property. He prepared advertising flyers and newspaper advertisements, and sought to identify the types of companies which might be interested in the property.

9. Follman believed that he needed a copy of the lease to show prospective purchasers who would be interested in encumbrances on the property. In October and early November, Follman made more than one request for a copy of the lease. In mid-November, Lieber forwarded to Follman a copy of the lease.

10. The lease provided for assignment of the lease upon the lessor's written consent, which was not to be unreasonably withheld. Under paragraph 23 of the lease, lessee could require the lessor to construct certain additions to the facility; if the lessor was unwilling to do so, lessee could either construct the addition at its own expense or purchase the land and property at a price not to exceed the original cost of $2.1 million. The actual value of the property, per appraisal in December of 1982, was $3.4 million.

11. Upon reviewing the lease, Follman concluded immediately that the paragraph 23 option clause would hinder his efforts to obtain the $4 million asking price. He spoke with Lieber and confirmed in a letter dated November 23, 1982, his concern over the option clause, and at some point suggested to Schapiro the possibility of obtaining a waiver of the option clause. However, this was never done.

12. The Court credits the deposition testimony of Daly, Schapiro, and Lieber that they had previously been unaware of the option provision in the lease. However, they did not believe that Star was financially capable of exercising the option and Follman was instructed to continue marketing the property for $4 million. Follman did not request, nor did API suggest, any modification of the listing agreement.

13. In early January of 1983, in response to a newspaper advertisement placed by Follman, Robert Goldwasser contacted Follman regarding the Star property. Goldwasser was president of Madison

**466**

Warehouse Corporation, a wholly-owned subsidiary of Pacific Holding Corporation.

14. Goldwasser was familiar with the Star property, having bid unsuccessfully on it when it was completed in the late 1960s, and had called Follman to see if it was the same building. Goldwasser had approached Kennedy, one of Star's vice-presidents, in 1981 about acquiring the Star building. At that time, Star had no interest in the proposition and no serious negotiations occurred.

15. At his request, Goldwasser was sent a copy of the lease by Follman. Goldwasser apparently had some familiarity with the option clause from his original interest in the building. Upon reviewing the lease, Goldwasser consulted an attorney and was advised that the option provision was valid. He then talked with the Star officers in Chattanooga.

16. Goldwasser contacted Kennedy and told him of his interest in the Star property. Kennedy told him to "put it in writing," and on January 13, 1983, Goldwasser sent Kennedy a letter indicating his interest in assuming Star's lease. In late January, Kennedy and McKenzie travelled to St. Louis to discuss a possible acquisition.

17. In St. Louis and thereafter, Goldwasser, Kennedy, and McKenzie discussed both acquiring the property and acquiring the operations, including accounts and equipment. The parties favored assignment of Star's lease to Madison, with a commission to Star on all storage revenues from Star's customers. The parties were alternatively prepared, in regard to acquiring the property, to have Madison acquire Star's stock or to have Star purchase the property under the option for Madison's later purchase.

18. In a letter to Schapiro dated March 4, 1983, Kennedy requested API's consent to assignment of Star's lease to Madison.

19. By this time, API was aware that Madison might try to acquire the Star property under the option provision of Star's lease. Follman and Goldwasser had discussed the property several times and had discussed the value of the property, although no firm offer was ever made. Follman suspected that Goldwasser might try to purchase the property at the lower contract price; he attempted to keep abreast of the Star-Madison negotiations, although he was never involved in them, and he reported this concern to API.

20. API did not wish to sell the Star property for $2.1 million under the contract after it had been appraised at $3.4 million. They informed Kennedy that they needed financial information on Madison in order to consider the assignment.

21. Goldwasser wrote to Schapiro on March 15, 1983, and sent the requested financial information. Goldwasser stated in his letter that if API did not consent to the assignment, "Madison will pursue other avenues to acquire the property." Lieber responded to this letter by requesting further financial information and suggesting that Goldwasser contact Follman with an offer to purchase if he was interested in acquiring the property. The letter also stated that any assignment of the lease would not contain an assignment of paragraph 23.

22. Before receiving this letter, Goldwasser began preparing to acquire Star's stock should the assignment not go through. Upon becoming aware of that fact, and knowing the financial strength of Madison's parent corporation, API decided that it was pointless to fight the assignment. On April 8, 1983, Lieber wrote to Follman to cancel the listing agreement.

23. The listing agreement provided for cancellation of the agreement upon sixty days prior notice in writing, and provided for a commission if the property was leased or sold within 120 days after the term of the agreement.

24. In early May of 1983, Star assigned its lease to Madison with API's written consent. Madison exercised the paragraph 23 option and purchased the property for

$2.1 million on August 18, 1983. Follman's subsequent request for a commission was refused by API.

### Conclusions of Law

1. This Court has jurisdiction of this action under 28 U.S.C. § 1332.

2. The Star property referred to in the listing agreement between API and Follman Properties Company was sold less than 120 days after effective termination of the agreement. Thus, plaintiff's entitlement to the six percent commission depends upon whether plaintiff "procured" Madison as a buyer, as required for it to earn a commission.

3. In *Staubus v. Reid,* 652 S.W.2d 293, 295 (Mo.App.1983), the term "procuring cause" was defined as follows:

> For a real estate broker's services to constitute the "procuring cause" of a sale, the broker's initial efforts in calling the prospective purchaser's attention to the property must have set in motion a series of events which, without break in continuity, and without interruption in negotiations, eventually culminates in the sale.

(citation omitted.)

4. It is unquestionable in this case that Follman's undertaking to advertise the property on API's behalf provided Madison its first knowledge that the property was available, and served as the sole initial stimulant to rouse Madison's interest as a possible purchaser. *See E.A. Strout Realty Agency, Inc. v. McKelvy,* 424 S.W.2d 98, 101–02 (Mo.App.1968). Follman sent Goldwasser a copy of the lease under which Madison eventually acquired the property, and Goldwasser's efforts to obtain the property were immediate and uninterrupted.

5. In Missouri, "the broker who introduces the purchaser and who is instrumental in finding him is ordinarily the procuring cause of a sale...." *Holman v. Fincher,* 403 S.W.2d 245, 250 (Mo.App.

1966). Follman clearly introduced the purchaser to the property's availability, albeit the ultimate purchase was made indirectly through exercise of the lease's option clause. Follman cannot be said to have abandoned the deal in light of his persistent efforts to elicit an offer from Goldwasser and to keep abreast of the Madison-Star negotiations.

6. There is no evidence supporting plaintiff's claim for relief against the Rabinowitz defendants.

7. Under Mo.Rev.Stat. § 408.020, plaintiff is entitled to prejudgment interest at nine percent per annum from date of sale.

### JUDGMENT

Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this judgment.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be and the same is entered in favor of plaintiff, Follman Properties Company, and against defendants, Thomas Francis Daly, Robert L. Nessen, and Jack B. Sangunett, individually and in their capacities as trustees of API Trust, in the amount of $126,000.00, along with prejudgment interest at 9% per annum from August 18, 1983, postjudgment interest at 9.15% per annum, and costs.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that judgment be and the same is entered in favor of defendants Allan and Wilbur Rabinowitz.